# TRAVERS *v.* REINHARDT.*

---

WILLS; SUBSTITUTION OF WORDS IN CONSTRUING A WILL; DETERMINABLE FEES; WITNESSES; FALSUS IN UNO FALSUS IN OMNIBUS; MARRIAGES; CONFLICT OF LAWS; EVIDENCE.

1. In construing the expression in a will—"without leaving a wife, *or* a child, or children"—the word "and" will not be substituted for the disjunctive "or," where the dominant intention of the testator in the disposal of his estate, as appears from his will, does not require such substitution, and especially where the repetition of the same expression in another part of the will shows deliberation and care by the testator in the selection of words. Under such circumstances, the

---

*Validity of Marriage—Conflict of Laws.—*The authorities determining what law governs as to the validity of a marriage are fully presented in editorial note to *Hills* v. *State*, 57 L. R. A. 155.

words used, being plain and unambiguous, must be given their or-
dinary and usual meaning, and cannot be controlled by conjecture.

2. Where a testator having several sons and three daughters, after devising
the greater portion of his estate to his sons in two classes of devises,
in one of which he used the words "in fee simple," while in the other
he omitted these words, directed, as a general provision, that, "if any
of my sons should die without leaving a wife, or a child, or children,
living at his death, then his estate herein devised to him, saving and
excepting those portions thereof expressly granted and so named to
be 'in fee simple,' * * * shall go, and be invested in fee, to my
surviving sons, and the child or children of such as may be dead,
such child or children representing the share of the father; but **if**
either of my sons shall, at his death, leave a wife, either with or
without a child or children, such wife shall be entitled to her dower
rights and privileges,"—on the death of two of the sons, each leaving
a wife, but no child or children, surviving him, the real estate de-
vised to them, and coming within the limitation of such general pro-
vision, will go to their heirs or devisees, and not to the heirs of a
brother who survived them.

3. Where a witness, having no interest in the subject-matter of the liti-
gation, on cross-examination admitted having made a false statement
on her direct examination, it was *held,* upon a review of her evidence,
which showed that the statement related to a matter not material in the
determination of the case, that it was made upon a strong temptation to
shield the reputation of another person, and that its falsity was admit-
ted by the witness under no apparent fear of contradiction or penalty;
and where it also appeared that no attempt was made to contradict
her other testimony, which was corroborated by documentary evidence
in all respects but one, and that consisted of a statement not incredible
and of no practical importance,—that the conditions presented did not
compel the application to her evidence of the maxim, *Falsus in uno,
falsus in omnibus.*

4. An informal marriage in or about 1865 by contract *per verba de prœ-
senti* constituted a valid marriage by the common law, which then, at
least, prevailed in this District.

5. Whether a man who was domiciled and died in New Jersey was lawfully
married will depend upon the law of that State; and, if the marriage
was lawful there, it will be deemed lawful here.

6. In New Jersey a valid marriage may be entered into by contract *per
verba de prœsenti.* No particular ceremony is necessary; nor is it of
any consequence that the original relations of the parties may have
been illicit, provided there be sufficient evidence that a contract of mar-
riage was thereafter made.

7. Where a man, after going through a fictitious marriage ceremony in

Virginia with a woman, in 1865, lived with her in Maryland and New Jersey until his death, in the latter State, in 1883, during which time he publicly recognized her as his wife, and she joined with him in the execution of a mortgage in which she was named as his wife, and was described as such in an unattested will, and also by his last will, which was admitted to probate in New Jersey, by which latter will he devised the residue of his estate to her "while she remains my wife," it was *held* that she was his lawful wife under the law of•New Jersey, his last domicil, and that the marriage, being lawful there, would be recognized as lawful here.

No. 1525.   Submitted May 5, 1905.   Decided May 23, 1905.

HEARING on an appeal by complainants and certain of the defendants (who severed from their codefendants) from a decree of the Supreme Court of the District of Columbia, overruling exceptions to and confirming a report of the auditor in a suit for partition, in which the property had been sold by consent of the parties, and the proceeds held to await the final determination of the cause.                                      *Affirmed.*

The COURT in the opinion stated the case as follows:

This suit was begun by a bill filed by Amelia C. Travers and her husband, Charles E. Travers, whose assignee she is, for the partition of certain real estate in the District of Columbia formerly belonging to Nicholas Travers, who died testate in January, 1849. The defendants are heirs at law or claimants under certain devisees of the said Nicholas Travers. The property has been sold by order of the court, all parties consenting thereto, and the distribution of the proceeds of the sale awaits the final determination of the interests of the several claimants thereof.

Nicholas Travers devised a large estate in unequal proportions to his four sons and three daughters,—Elias, Nicholas, Joseph, James, Mary, Elizabeth, and Sidney Virginia. The greater portion was devised among the sons named in two classes of devises. In those of the first class he used the words "in fee

simple." In the second class these words are omitted. The distinction made between the two is expressly recognized and referred to in the following general provision: "With regard to the several estates hereinbefore devised to my several sons, it is hereby declared to be my will, and I do order and direct, as a general provision, that if any of my sons should die without leaving a wife, or a child, or children living at his death, then his estate herein devised to him, saving and excepting those portions thereof expressly granted and so named to be 'in fee simple,' and which they can sell and dispose of as they think fit, shall go, and be invested in fee, to my surviving sons, and the child or children of such as may be dead, such child or children representing the share of the father; but, if either of my sons shall, at his death, leave a wife, either with or without a child or children, such wife shall be entitled to her dower rights and privileges." The property involved in this controversy is the real estate (and now the proceeds thereof), coming within the limitations of the foregoing general provision, that was devised to Joseph Travers and James Travers. Joseph Travers died intestate in September, 1882, leaving a widow since deceased, but no child or children, or descendants of such. His heirs at law were his brothers Elias and James and his three sisters before mentioned. James Travers died in October, 1883, leaving a will devising his real estate in the District of Columbia to his surviving brothers and sisters, and all property elsewhere to his wife. Whether he was ever lawfully married to the person named in the will as his wife is one of the questions to be determined.

Elias Travers died intestate on April 29, 1887, and his heirs at law are his children, Charles E. Travers and the defendants John H. Travers, Joseph Travers, James W. Travers, Sidney Travers, and Kate M. M. Owens. These last claim the entire interest in the real estate devised to Joseph and James Travers that comes within the limitations of the provision of the will of Nicholas Travers before quoted. The auditor, to whom the settlement of the account of sales and the settlement of the interests of the parties had been referred, found against this contention. He

found, also, that James Travers had been married to the wife named in his will, who survived him.

His report was confirmed, and a decree entered for the distribution of the proceeds of the sale in accordance therewith, from which this appeal has been prosecuted by the heirs of Elias Travers.

[The further material facts will be found stated in the opinion.]

*Mr. A. A. Birney, Mr. C. H. Stanley, Mr. Edward A. Newman,* and *Mr. Fillmore Beall,* for the appellants:

1. If, under the will of his father, Joseph Travers took an estate in fee, which, upon his marriage, became indefeasible and descended to his heirs, it is conceded by the appellants that, as to the Joseph Travers part of the property in question, the decree below is right. If, to render his estate indefeasible, it was essential that he should leave a child surviving him, it was wrong. The language of the devises was, without more, ample to create a fee simple. Qualified by the general provision, each of the devises affected thereby became a determinable fee in the first taker, with an executory devise over to the surviving sons and the child or children of such as might be dead. *Abbott* v. *Essex Co.* 18 How. 202; *Richardson* v. *Noyes,* 2 Mass. 56; Underhill, Wills, pp. 1272, 1274. It is a rule in construing wills that, where a general intent is apparent upon the face of the will, and a particular intent is also expressed which conflicts with such general intent, the latter will prevail. 2 Wms. Exrs. 7th Am. ed. p. 333; *Chase* v. *Lockerman,* 11 Gill & J. 286; *Thompson* v. *Young,* 25 Md. 459; *Taylor* v. *Watson,* 35 Md. 524; *Smith* v. *Bell,* 6 Pet. 68; *Re Banks,* 87 Md. 425. The construction of the will is to be made from the entire instrument, including the codicil, and the intent of the testator, thus ascertained, be permitted to govern. *Jones* v. *Wright,* 2 Bligh, 49; *White* v. *Crenshaw,* 5 Mackey, 115. Where two clauses in a will operate on the same property, devising it differently, giving it to different devisees, or showing a different technical intention, the latter clause will prevail. *Dugan* v. *Hollins,* 13 Md. 149; *Manning* v. *Thurs-*

*ton,* 59 Md. 226. To apply these general principles to the will in question: The general intent of the testator was that his real estate should descend only through his sons, and that his daughters and their descendants should not have share therein. The general intent of the testator being to keep his real estate within the male line of descent to the exclusion of the female, is it to be supposed that he was willing that this intent should be defeated by the mere marriage of a son? He might be willing measurably to provide for a widow, through an allowance equal to dower, but the existence of the widow affords no reason for letting in the daughters to heir. Courts will change or mold language so as to give effect to the intention. Schouler, Wills, 3d ed. sec. 477; Jarman, Wills, 505, 507; *Doe* v. *Watson,* 8 How., 263, 272; *Hance* v. *Noble,* 172 U. S. 383, 389; *Shugloff* v. *Johns,* 87 Md. 273; *Scarlett* v. *Montell,* 95 Md. 157; *Ward* v. *Barrows,* 2 Ohio St. 242. The words "wife, or child, or children" should be read "wife *and* child or children." The cases cited and many others justify such change.

2. If the will be construed as we contend, the proceeds of the devises to James, affected by the general provision, and the unsold property similarly affected, must be awarded to the appellants, for it will not be claimed that he left a child surviving him; if, however, this point be ruled against the appellants, they must yet succeed, unless it has been shown, either, first, that James Travers married and his wife survived him, or, second, that he and his brother Elias (the last survivor of the brothers) entered into a binding agreement with their sisters that they should share as heirs in the property thus devised to James. No such marriage was proved, and the alleged agreement or estoppel was not established.

3. Both the auditor and the judge found that a ceremony of marriage between James Travers and his alleged wife was performed by an unauthorized person. This was error. This finding is made upon the unsupported testimony of the woman. She admittedly made a false statement in her testimony. The maxim, *Falsus in uno, falsus in omnibus,* applies. In her desperate attempt to show that James Travers left a child surviving

him, she swore falsely to matters as to which she could not be mistaken, and confessed the truth only when it became apparent to her that it was known and could be proved. See *The Santissima Trinidad,* 7 Wheat. 339; *Dunlop* v. *Patterson,* 5 Cow. 243; *Huber* v. *Teuber,* 3 MacArth. 484; 2 Elliott, Ev. sec. 955.

4. The deed and the wills.—We concede that a marriage may be proved by testimony of general reputation of the parties as husband and wife. Here was no such testimony. No witness was produced but the woman, who certainly could not prove her own reputation. The mortgage and the wills are papers which might have afforded a basis for reputation; by themselves they are only statements made by James Travers. Without supplemental proof of reputation among neighbors and friends, the mortgage and the wills do not even tend to prove marriage. *Barnum* v. *Barnum,* 42 Md. 251. The auditor and the court should have found there was no marriage in fact. *Reading F. Ins. Co's Appeal,* 113 Pa. 204; *Arnold* v. *Cheeseborough,* 46 Fed. 701, Affirmed in 58 Fed. 840.

5. If the woman's story be true, yet there was no marriage, for no license to marry was issued to them, and without such license there could be no valid marriage. Virginia Statute 1849, secs. 1–7, regulating marriages in that State, and in force in August, 1865. This statute required that in all cases a license should issue, and without it there could be no valid marriage. *Offield* v. *Davis,* 100 Va. 250; *Beverlin* v. *Beverlin,* 29 W. Va. 732. The Virginia decisions are conclusive that without a license there could be no marriage in that state. *Leffingwell* v. *Warren,* 2 Black, 599, 603; *Green* v. *Neal,* 6 Pet. 291; *Bauserman* v. *Blunt,* 147 U. S. 652; *Meister* v. *Moore,* 96 U. S. 82. See citations in Rose's Notes on U. S. Rep. vol. 12, p. 323. State courts adopt a similar rule, and hold the construction placed upon the statute of another State, by the supreme court of that State, to be binding upon them. *Bloodgood* v. *Grasey,* 31 Ala. 575; *Thrift* v. *Hannah,* 2 Leigh, 300; *Sanborn* v. *Perry,* 86 Wis. 367. So far is this rule carried, that if the highest tribunal of a State adopts new views as to the proper construction of such a statute, and reverses its former decisions,

the Federal courts and courts of other States will follow the latest adjudication. *United States* v. *Morrison,* 4 Pet. 124, 137; *Green* v. *Neal,* 6 Pet. 291; *Leffingwell* v. *Blunt,* 147 U. S. 652. And the weight or authority of the decision is not affected by the fact that it was made after the supposed marriage, and after the persons affected by it had left the State. *Bloodgood* v. *Grasey,* 31 Ala. 575.

6. A marriage void where celebrated is void everywhere. Bishop, Marr., Div. & Sep. sec. 886; Story, Confl. L. pp. 215–217, secs. 93, 106; *Patterson* v. *Gaines,* 6 How. 550, 587; *Phillips* v. *Gregg,* 10 Watts, 168; *McDeed* v. *McDeed,* 67 Ill. 545; *Hutchins* v. *Kimmell,* 31 Mich. 126; *Dalrymple* v. *Dalrymple,* 12 Hagg. Consist. Rep. 58; *Mauro* v. *Saunders,* 6 Bligh, 468; *Rose* v. *Rose,* 4 Wilson & S. 289.

7. *Atlantic City R. Co.* v. *Goodwin,* 62 N. J. L. 394, decides no more than that in New Jersey no statute has changed the common-law rule governing the validity of marriages, and that a contract of marriage *per verba de præsenti,* made in New Jersey, is valid. But that court has also held that the validity of a marriage is governed by the *lex loci contractus* (*Clark* v. *Clark,* 52 N. J. Eq. 650; *Smith* v. *Smith,* 52 N. J. L. 208), and that, where it is shown that there was no ceremony, proof of cohabitation as man and wife will not prove marriage. *Goldbeck* v. *Goldbeck,* 18 N. J. Eq. 42. That court also holds that, if there be proof of a ceremonial marriage, the validity of that ceremony must determine if there was or was not a marriage; and that subsequent cohabitation and reputation as husband and wife must be regarded as having their origin in such marriage, and will not justify a presumption that the parties contracted a subsequent marriage. *Voorhees* v. *Voorhees,* 46 N. J. Eq. 411; *Wallace's Case,* 49 N. J. L. 535; *Pearson* v. *Howey,* 11 N. J. L. 12. To the same effect are the decisions elsewhere. *Barnum* v. *Barnum,* 42 Md. 251; *Cartwright* v. *McGown,* 121 Ill. 388; *O'Gara* v. *Eisenlohr,* 38 N. Y. 296; *Blackburn* v. *Crawford,* 3 Wall. 175. The true doctrine is that cohabitation and reputation do not constitute marriage, but are evidence upon which in

proper cases a presumption of marriage may be founded. *Smith* v. *Smith,* 52 N. J. L. 208.

8. There was no change of status through change of domicil. The sojourn for a few days in the District of Columbia did not marry the parties. This was like their sojourn on Shrewsbury river, the additional feature being that James Travers had formerly been domiciled here, and the land in question lies here. But the *lex rei sitæ* has no application in determining the status of persons. This must be decided by reference to the law of the State or country where such status or condition had its origin, and the status so ascertained adheres to the party everywhere. *Ross* v. *Ross,* 129 Mass. 243; *Smith* v. *Kelly,* 23 Miss. 167.

9. The only domicil of the parties after their connection began was in Maryland. The Maryland decisions settle this question in the negative. The "common-law marriage" is unknown to the law of that State. *Denison* v. *Denison,* 35 Md. 297; *McLaughlin* v. *Barnum,* 42 Md. 297; *Richardson* v. *Smith,* 80 Md. 89.

10. The cohabitation of the parties did not marry them. The defendants having attempted to prove a ceremonial marriage in Virginia at a fixed time and place, they will not "be permitted to rely upon other facts and circumstances as a ground of presumption that a marriage may have taken place at some different time and place." *Barnum* v. *Barnum,* 42 Md. 251; *Blackburn* v. *Crawford,* 3 Wall. 175. See also *Reading F. Ins. Co's Appeal,* 113 Pa. 204; *Arnold* v. *Cheeseborough,* 46 Fed. 701, Affirmed in 58 Fed. 840; *Rose* v. *Rose,* 67 Mich. 619; *Williams* v. *Williams,* 46 Wis. 464; *Jones* v. *Jones,* 45 Md. 144; *Foster* v. *Hawley,* 8 Hun, 68; *Harbeck* v. *Harbeck,* 102 N. Y. 714; *Brown* v. *Beckett,* 6 D. C. 253; *Hunt's Appeal,* 86 Pa. 294; *Goldbeck* v. *Goldbeck,* 18 N. J. Eq. 42; *Cartwright* v. *McGown,* 121 Ill. 388; *Cargile* v. *Wood,* 63 Mo. 501; *Williams* v. *State,* 44 Ala. 24.

11. There was no evidence of reputation. No witness was called to show that the parties were reputed to be man and wife. There was no testimony except that of the alleged wife on the subject. This was wholly insufficient. *Com.* v. *Stump,* 53 Pa.

132, Cited in 112 U. S. 459; 24 Am. & Eng. Enc. Law, 2d ed.
p. 599; *Jones* v. *Hunter,* 2 La. Ann. 254; *Taylor* v. *Swett,* 22
Am. Dec. 159, note; *Arnold* v. *Cheeseborough,* 46 Fed. 701,
Affirmed in 58 Fed. 833. There must be proof of public recog-
nition. *Maryland* v. *Baldwin,* 112 U. S. 495; *Nathan's Case,*
2 Brewst. (Pa.) 149.

*Mr. William A. Gordon, Mr. George E. Hamilton, Mr. M. J.
Colbert,* and *Mr. J. Holdsworth Gordon* for the appellees.

Mr. Chief Justice SHEPARD delivered the opinion of the
Court:

Upon the admitted fact that Joseph Travers, who died intes-
tate, had been lawfully married to a wife who survived him, and
assuming, for the time being, that James Travers, who devised
all of his estate in the District to his surviving brothers and sis-
ters, left a surviving wife also, the question to be determined is,
whether their interests in the real estate embraced within the
terms of the general provision of the will of Nicholas Travers
passed to the heirs at law of the one, and the devisees of the
other, or became vested in the surviving brother, Elias.

The answer involves the ascertainment of the intention of the
testator as expressed in the language of the general provision,
which, having been set out above, need not be repeated.

The claim that the entire estate became vested in Elias
Travers upon the death of his brothers Joseph and James, re-
spectively, without leaving a child or children, rests upon the
contention that the dominant intention of the testator was to
retain the succession, as regards the property embraced in the
limitations of the general provision, in the direct line of his
male heirs; and that this dominant intention compels a construc-
tion of the general provision that would substitute the word
"and" for the disjunctive "or" where it first occurs in the line
"without leaving a wife, or a child, or children." We agree
with the opinion expressed by the auditor and the learned trial
justice, that there is no expression of such a controlling intention

as to require this substitution. The words used are plain and unambiguous. This being so, they must be given their ordinary and usual meaning, and cannot be controlled by conjecture. The same words are repeated in another part of the general provision itself; and at the end of the first item of disposition in the will it is provided that certain of the devises therein "shall be subject to the general provision hereinafter made in case of any of my sons dying without having a wife, or a child, or children." This repetition of the phrase tends to show deliberation and care in the selection of words expressive of the testator's intention.

That Elias Travers himself, and after his death his heirs, took an entirely different view of the testator's intention from that now maintained on their behalf, is conclusively shown by the testimony introduced by the appellants in support of an allegation in their answers setting up an agreement by way of family settlement. It was alleged that in December, 1882 (after the death of Joseph), Elias and James Travers entered into a written agreement with their three sisters, by which it was provided that the interest of Joseph in the property under the operation of the general provision aforesaid should be treated as the joint and equal property of all of the said parties, which said agreement was carried into effect by intrusting the property to a joint agent, who distributed the revenues thereof in accordance with its terms; that after the death of James Travers the same agreement was extended to his interest; and that after the death of Elias Travers the revenues of the undivided property were collected and distributed by the same agent among the heirs of all in their proper proportion until a short time before the filing of the amended bill in this suit.

No such written agreement could be found, nor could direct proof of it be made, because all of the parties who would have had any actual knowledge of the same had departed this life before the controversy began. In the view that we have taken of the proper disposition of the case, it is not necessary to determine whether the circumstantial evidence is sufficient to show that such an agreement was in fact executed as alleged. Whether so or not, Elias Travers certainly acquiesced in the claim of his

sisters. The evidence shows beyond question that after Joseph's death the rents of his portion were distributed equally between Elias, James, and the three sisters. On January 1, 1886, Elias joined his sisters in the lease of a parcel of the property now in question to one Smith, in which the lessors are recited as "the only heirs at law of the late James Travers, deceased," and which provided that the rent should be paid to the lessors and surrendered to them and their heirs. After Elias's death the same distribution of the rents of the parts of the property devised to Joseph and James was continued.

The only material question that remains for determination is whether James H. Travers was survived, as alleged, by a lawful wife. The only evidence of the marriage consists of the testimony of the alleged wife, since married to another person. She testified to the following facts, substantially: She was an orphan seventeen years old when she met James H. Travers, and her domicil was in West Virginia. James H. Travers lived in the District of Columbia. She went with him to Alexandria, Virginia, in August, 1865, where what she supposed to be a regular marriage ceremony was celebrated between them. There was no marriage license in fact, and the person who performed the pretended marriage ceremony was not a minister, though she believed him to be one at the time. They cohabited thereafter until James Travers's death at Point Pleasant, New Jersey, on November 1, 1883. They first took a trip to New Jersey; were in New York on several visits, and spent about three weeks in the city of Washington, boarding with a tenant of Travers. She believed that she had been lawfully married until she learned the truth about six years afterwards. He always said "that it was all right, and we were just as much married as if we had been married before a priest or a minister." In 1867 he bought a farm in Talbot county, Maryland, where they lived together nearly sixteen years. During the whole time he called her and introduced her as his wife, and she was so recognized in the community generally. They removed to Point Pleasant, New Jersey, in 1883, and she was there recognized and reputed to be his wife until his death. She had two children by James Travers,

both of whom were stillborn. By way of corroboration, a mortgage, executed on September 27, 1867, to secure the purchase money of the Talbot county farm, by James Travers and his wife, Sophia V. Travers, was read in evidence. She was named therein as his wife, and her acknowledgment was so taken and certified to by a justice of the peace. The instrument was duly recorded. An unattested will purporting to have been executed by James Travers in Talbot county, Maryland, on February 8, 1881, in which the bulk of his estate is devised and bequeathed to "my wife, Sophy Virginia Travers," was also produced. Another will was read in evidence, that was made at Point Pleasant, New Jersey, October 5, 1883. This was duly executed and attested by three witnesses. It was probated in the proper court in New Jersey, and letters testamentary were issued to said Sophia V. Travers. Later it was registered in the District of Columbia. By this will the testator devised all of his estate in the District of Columbia to his brothers and sisters. The remainder of his property of every description he devised and bequeathed, as recited, "to my wife while she remains my widow," with full power of alienation, etc., with remainder over to a daughter of such as may remain undisposed of at her decease. It is further recited: "In the event of my wife's contracting another marriage then it is my will that she shall possess and enjoy as of her own right only one third of the property remaining." By the last clause his wife is appointed sole executrix.

It is contended that no weight whatever should be given to the oral testimony above summarized, because on cross-examination the witness admitted that she had testified falsely in one particular. It appears that on her first examination she became greatly excited and abruptly left the examiner's office. Later her cross-examination was resumed in Philadelphia, where she had her residence. She then confessed to having made a false statement relating to a matter not hereinbefore stated. We can not agree with the contention that the conditions presented compel the application to this evidence of the maxim, *Falsus in uno, falsus in omnibus.* The witness had no interest whatever in the subject-matter of the litigation. The single false statement re-

lated to a matter not material in the determination of the case. Its recital is unnecessary, it being sufficient to say that it involved the reputation of another person, and that the temptation to shield that reputation was a strong one indeed. Having made the statement, she subsequently admitted its falsity under no apparent fear of contradiction or penalty. No withdrawal was made of any statement concerning her relations with James Travers, and no attempt was made to contradict any one of them, although the cross-examination shows that inquiry had been made in the community in which she lived so long in Maryland concerning his representations that she was his wife. Moreover, the documentary evidence before recited corroborates every statement made by her save that relating to the pretended marriage ceremony. That statement does not appear to be incredible, but whether it be true or false is, in our view of the case, of no practical importance.

The legal status of the said Sophia V., as the wife of James Travers at the time of his decease, does not depend upon the law of Virginia where the pretended marriage ceremony was performed. And it may be conceded that the pretended marriage was absolutely void in that State for the want of the statutory license. *Offield* v. *Davis,* 100 Va. 250, 40 S. E. 910. Nor does it depend upon the law of Maryland wherein so many years of the alleged married life of the parties were spent. Consequently it is unnecessary to determine whether, in that State, though a valid marriage will be presumed upon proof of cohabitation, general reputation, and acknowledgment of the existence of the relation, it will so be in a case where it is shown that cohabitation began without the requisite ceremony. See *Barnum* v. *Barnum,* 42 Md. 251, 296; *Richardson* v. *Smith,* 80 Md. 89, 93, 30 Atl. 568.

That an informal marriage by contract *per verba de præsenti* constitutes a valid marriage by the common law, which then, at least, prevailed in the District of Columbia, there can be no doubt. *Meister* v. *Moore,* 96 U. S. 76, 78, 24 L. ed. 826. But whether a lawful marriage has been shown in this case depends upon the law of New Jersey; where the parties had their domicil

at the time of the death of James Travers. If lawful there it will be recognized here. It seems well settled in that State that a valid marriage may be entered into by contract *per verba de præsenti;* no particular ceremony is necessary. Nor is it of any consequence that the original relations of the parties may have been illicit, provided there be sufficient evidence that a contract of marriage was thereafter made. *Atlantic City R. Co.* v. *Goodin,* 62 N. J. L. 394, 401, 45 L. R. A. 671, 72 Am. St. Rep. 652, 42 Atl. 333.

That was an action for damages for an injury resulting in death, brought by the alleged widow of the deceased. There had been a ceremonious marriage between the parties many years before, but at that time Goodin had a lawful living wife from whom he had separated. After obtaining knowledge of that fact, plaintiff continued to cohabit with him. About 1892, the real wife died. Presumption of marriage, it was said, could not be indulged from the mere fact of cohabitation illicit in its commencement. The plaintiff testified, however, to a contract with Goodin, made verbally after the death of his first wife. There was no other evidence tending to show such a contract save a declaration made by Goodin sometime in 1892 or 1893, to a niece of plaintiff, and testified to by her alone, that, "your aunt now is my lawful wife." Upon this evidence plaintiff was held to be his lawful wife.

The testimony in this case is far stronger. The alleged wife testified to statements made to her by James Travers, after her discovery of the fact of the unlawfulness of the marriage, tending in some degree to warrant an inference of contract. This was followed by his public recognition of her as his wife, testified to by her, and shown in the recitals of the mortgage and of the unprobated will written by himself. After taking up residence in New Jersey, he continued to recognize her publicly as his wife. Whatever doubt there might be of the sufficiency of this evidence alone is settled by the recitals of the will made in New Jersey. Therein he devised and bequeathed certain of his estate to her as his wife, without giving her name, the amount thereof dependent upon her remaining his widow. And

by another recital, whether so intended or not, he met the very condition of a previous actual contract of marriage by the words, "in the event of my wife's contracting another marriage." She could not contract another marriage unless she had first contracted one with him.

We are of the opinion that the evidence is sufficient to show that James Travers had a lawful wife at the time of his decease. In accordance with the foregoing conclusions, the decree must be affirmed with costs; and it is so ordered.     *Affirmed.*

An appeal to the Supreme Court of the United States was allowed June 6, 1905.