**WALLACE, Secretary of Agriculture, v.
HUDSON–DUNCAN & CO.**

No. 8716.

Circuit Court of Appeals, Ninth Circuit.

Sept. 20, 1938.

986

Robert H. Jackson and Thurman Arnold, Asst. Attys. Gen., John W. Aiken, Sp. Asst. to Atty. Gen., Gordon P. Peyton, Atty., Dept. of Agriculture, of Washington, D. C., Wendell Berge, Sp. Asst. to Atty. Gen., Mastin G. White, Solicitor, Department of Agriculture, of Washington, D. C., and Carl C. Donaugh, U. S. Atty., of Portland, Or., for appellant.

Albert W. Gentner, of Portland, Or., for appellee.

Farrand & Slosson, George E. Farrand, Leonard B. Slosson, and Edward E. Tuttle, all of Los Angeles, Cal., for amici curiae.

Before DENMAN, MATHEWS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal by the Secretary of Agriculture from a decree of the district court holding that certain provisions of the Secretary's Order, given under the Agricultural Adjustment Act, 7 U.S.C.A. § 601 et seq., violate the Constitution and directing the Secretary to exempt the appellee from its operation.

Appellee, hereinafter called the Company, is a corporation engaged in the states of Oregon and Washington in the business of packing, processing, and distributing unshelled walnuts, both in intrastate and interstate commerce. It is not a grower of walnuts, but markets them through its wholesale and retail stores or sells them to other distributors. Its bill below asked a declaratory decree[1] that the regulatory provisions of the Order of the Secretary of Agriculture, made for the walnut industry in Oregon, Washington and California, under the authority of the Agricultural Adjustment Act, as amend-

---

[1] "(15) Petition by Handler and Review. (A) Any handler subject to an order may file a written petition with the Secretary of Agriculture, stating that any

ed, 7 U.S.C.A. § 601 et seq., impose an unlawful obligation upon the Company.

The order is purposed to create a parity in the price of unshelled walnuts with non-agricultural commodities by diminishing the supply in the consuming markets with a consequent price rise. It imposes on the Company an obligation to contribute a percentage of its intended shipments to a Control Board or in lieu thereof certain payments to the Board as a consideration for engaging in interstate commerce in that commodity. Noncompliance with the regulation would require the Company to market the walnuts only in the state in which it acquired them.

The Secretary, on the Company's petition to him, had ruled that the order and obligation are lawful. On the Company's bill to review the Secretary's ruling, the district court declared the order and obligation unlawful, as violating the Fifth Amendment of the federal Constitution, U.S.C.A.Const. Amend. 5, and made its decree directing the Secretary to make a ruling exempting the Company from the operation of his order. The Secretary brings this appeal.

At the hearing below, the Company opposed the admission of evidence bearing on the reasonableness of the order and it was excluded on the Company's stipulation that it was "not raising any question of fact whatsoever" and was "raising no question as to the reasonableness of the order".

Hence, we are required to assume there is not "any question of fact" that, as found by Congress in section 1 of the Act, 7 U.S.C.A. § 601, there exists a disparity between the price of walnuts and other commodities, causing the destruction of the purchasing power of walnut growers for industrial products; that the orderly exchange of walnuts for other commodities has broken down; and that the agri-cultural assets supporting the national credit thus have been seriously impaired. We have held in Edwards v. U. S., 9 Cir., 91 F.2d 767, 783-785, that it is within the police power of Congress in its area of regulation of interstate commerce, to remove or ameliorate these economic evils.

The Secretary in making the Order in question, is admitted formally to have complied with the provisions of the Act regarding hearings, the securing of a marketing agreement, the determining of an allotment to each shipper in interstate and foreign commerce in the crop year provided, the creation of a control board and the conferring on it of the power to dispose of the surplus to be given it by the packer by sale or donation to charity, and the approval of the order by the requisite portion of the growers of walnuts.

The Order of the Secretary provides for the regulation of walnut shipments in interstate and foreign commerce by a limitation of the amount of the Company's and other packers' intended interstate shipments and the control and disposition of a "surplus" found to be destroying the desired price parity. More specifically, the Order in effect requires that a packer, such as the Company, either (1) must sell or hold all the walnuts it acquires in the state of acquisition; or (2) export from the state not more than a percentage of its intended shipments determined by the Secretary for each "crop year", i. e. from September 1 to the succeeding August 31, upon the consideration of the delivery of the remainder of such intended export to a Control Board. The Board may sell the walnuts it receives to purchasers abroad or to shellers within the United States, at prices fixed by the Board, or may eliminate all or part of them from the market by donation or sale to charitable institutions in the United States,

such order or any provision of any such order or any obligation imposed in connection therewith is not in accordance with law and praying for a modification thereof or to be exempted therefrom. He shall thereupon be given an opportunity for a hearing upon such petition, in accordance with regulations made by the Secretary of Agriculture, with the approval of the President. After such hearing, the Secretary shall make a ruling upon the prayer of such petition which shall be final, if in accordance with law. "(B) The District Courts of the United States (including the district court of the United States for the District of Columbia) in any district in which such handler is an inhabitant, or has his principal place of business, are hereby vested with jurisdiction in equity to review such ruling, provided a bill in equity for that purpose is filed within twenty days from the date of the entry of such ruling. * * * "

Sec. 8c, subsection (15), Agricultural Adjustment Act, as amended, 48 Stat. 31, 49 Stat. 750, 753, 7 U.S.C.A. § 601 et seq., § 608c, subsec. (15).

with provisions that such sales or donations shall not enter the channels of trade in the United States as unshelled walnuts. The Board also has the power to release to interstate shipment through the contributing packers all or portions of the surplus delivered to it, if, in its opinion, the proper control of the interstate market warrants it. The proceeds of the disposition of the surplus and payments of credit value by the shippers are to be ratably apportioned and distributed to them by the Board; or (3) may export from the state all its intended interstate shipments upon the consideration of a payment to the Board, not of what the packer has sold them for, but of a certain "credit value", fixed for all shippers by the Board, of the surplus walnuts which otherwise would have been delivered to the Board.

Section 8c(6) (A) [2] of the Act authorizing a "limitation" of shipments warrants the provisions of the Secretary's Order for delivery of a limiting portion of the packers' intended shipments to the Board, the "surplus", with the Board's power to feed this surplus into the market, or otherwise limit the amount reaching the market by donations to charitable organizations. The Order is also authorized under 8c(6) (D) [2] of the Act, providing for the determining of the existence and extent of the surplus of walnuts and for the control and "elimination" of such surplus. The Board's control of the surplus is to this extent establishing successive "reserve pools" of the walnuts provided for by 8c(6) (E) [2] of the Act. Since the Act authorized the provisions of the Order, the questions left for our determination are those raised as to the constitutional lawfulness of these provisions.

We agree with the statement of the Company's brief of the portion of the Order with relation to the surplus that if the Company is to ship unshelled walnuts in interstate or foreign commerce "The order requires delivery of a percentage of the 'individual supply' handled or to be handled by a packer. [A 'packer' is defined as any processor or distributor of unshelled walnuts.] The 'individual supply' is defined as the walnuts packed during a crop year up to that time, and 'handling' is defined among other things, as a sale for shipment [or to ship] in interstate commerce. Delivery is required of walnuts 'to be' handled. Hence a delivery is required of walnuts *to be* sold in interstate commerce, but which have neither been sold nor shipped in interstate commerce, and the delivery is required to be 'before shipment'. To subject a person to the requirement to deliver, it is not even necessary that the walnuts have left the orchard where they were produced. The requirement of delivery applies to 'every packer'. 'To pack' is defined as to bleach, clean, grade or otherwise prepare for market in any manner whatsoever."

The Company argues that the delivery to the Board must be made as soon as the intent to ship is fixed in the packer's mind. We cannot agree with this for the Order requires merely that delivery of the surplus be made "before shipment". As we construe it, if there is no shipment, nondelivery to the Board would not constitute a violation of the Order.

---

[2] Sec. 8c(6) " * * * orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7) ) no others:

"(A) Limiting, or providing methods for the limitation of, the total quantity of any such commodity or product, or of any grade, size, or quality thereof, produced during any specified period or periods, which may be marketed in or transported to any or all markets in the current of interstate or foreign commerce or so as directly to burden, obstruct, or affect interstate or foreign commerce in such commodity or product thereof, during any specified period or periods by all handlers thereof.

\* \* \* \* \* \*

"(D) Determining, or providing methods for determining, the existence and extent of the surplus of any such commodity or product, or of any grade, size, or quality thereof, and providing for the control and disposition of such surplus, and for equalizing the burden of such surplus elimination or control among the producers and handlers thereof.

"(E) Establishing, or providing for the establishment of, reserve pools of any such commodity or product, or of any grade, size, or quality thereof, and providing for the equitable distribution of the net return derived from the sale thereof among the persons beneficially interested therein."

Agricultural Adjustment Act, as amended, Sec. 8c(6) (A), (D) and (E), 49 Stat. 753, 755, 756, 7 U.S.C.A. § 608c(6) (A), (D) and (E).

It is also true, as the Company contends and the Secretary admits, that "the surplus walnuts will, all of them for a while, and part perhaps permanently, remain within the state."

The unlawfulness which the Company's argument requires us to consider is—

I. Whether the requirement to deliver to the Board the surplus or its equivalent, as a consideration for interstate shipping, as an alternative to confining its sales solely to intrastate customers, constitutes a taking of property in violation of the last clause of the Fifth Amendment, U.S.C.A.Const. Amend. 5, or

II. Whether such requirement constitutes a deprivation of property or liberty in violation of the due process clause of the Fifth Amendment, or

III. Whether such requirement constitutes a federal regulation of intrastate commerce in violation of the Tenth Amendment, U.S.C.A.Const. Amend. 10, or

IV. Whether the Act attempts an unlawful delegation of legislative power.

**I. The Company has failed to establish a "taking" of property for public use without just compensation, or at all.**

This is not a case of the "taking" of property within the meaning of the last clause of the Fifth Amendment. There is no direct appropriation of property from the Company. Omnia Commercial Co. v. U. S., 261 U.S. 502, 508 et seq., 43 S.Ct. 437 et seq., 67 L.Ed. 773, and cases cited. The Order contains no absolute requirement of the delivery of walnuts to the Control Board. The requirement is a conditional one. If the Company chooses not to comply with the interstate requirements of the Order, it may nevertheless retain all its walnuts intrastate and dispose of them to intrastate buyers.

The Company does not claim that a net financial gain in its business would not result from enforcement of the Secretary's Order. Even if we assume (since the record does not disclose such facts) that the value of property rights of the Company would be materially reduced if the Company is confined to disposing of its walnuts solely intrastate because of its refusal to comply with the interstate requirements of the Order, this would not constitute a "taking" of property within the meaning of the last clause of the Fifth Amendment, but would be an instance of the destruction of property in the exercise of the commerce power.

The distinction between the direct appropriation of property and the destruction of property values in the exercise of governmental power is clearly drawn in Omnia Commercial Co. v. U.S., supra, page 508 et seq., 43 S.Ct. page 437 et seq., and cases cited.

In the Omnia Case, the appellant was owner of a contractual right to purchase steel plate from the Allegheny Steel Company at less than the market price. In October 1917, before any deliveries had been made, the United States government requisitioned the steel company's entire production of steel plate for the year 1918, and directed the company not to comply with the terms of the appellant's contract. It, therefore, became impossible for the steel company to carry out the contract. The court, while stating that "* * * the contract was of great value, and if carried out would have produced large profits," nevertheless held that the action of the United States did not constitute a "taking" of appellant's property in the contract within the meaning of the last clause of the Fifth Amendment. "The character of the power exercised," said the court, "is not material".

In Louisville & Nashville R. Co. v. Mottley, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297, 34 L.R.A.,N.S., 671, an act of Congress, in exercise of the commerce power, was interpreted as prohibiting the granting of interstate transportation except for cash. The effect was invalidation of a contract for transportation previously entered into and valid when made. It was held that the act did not have the effect of taking property without compensation. At page 484 of the opinion in 219 U.S., 31 S.Ct. at page 271, the court said:

"It is not determinative of the present question that the commerce act, as now construed, will render the contract of no value for the purposes for which it was made. In Legal Tender Cases [Knox v. Lee, 12 Wall. 457, 20 L.Ed. 287], above cited, the court, referring to the 5th Amendment, which forbids the taking of private property for public use without just compensation or due process of law, said: 'That provision has always been understood as referring only to a direct appropriation, and not to consequential in-

990

juries resulting from the exercise of lawful power. It has never been supposed to have any bearing upon or to inhibit laws that indirectly work harm and loss to individuals. A new tariff, an embargo, a draft, or a war, may inevitably bring upon individuals great losses; may, indeed, render valuable property almost valueless. They may destroy the worth of contracts.'"

In Edwards v. U. S., supra, we have held that the regulation of the Agricultural Adjustment Act is justified by the constitutional delegation of the power to regulate commerce. The regulation here involved is as much within that power as it is within the constitutional powers of the Congress to impose a new tariff, or embargo, or draft or to declare war.

The "taking" alleged by the Company must be based on the claim that the denial of the right to ship more than the established percentage of its future interstate orders *forces* it to make delivery of the remainder or its "credit value" to the Board. That is to say, it is a delivery or payment under the compulsive alternative of retaining intrastate all its unshelled walnuts.

We feel that this contention has been answered by the reasoning and the line of cases just presented. However, even if we should grant the rule apparently contended for by the Company that under certain circumstances the alternative of retaining the walnuts intrastate may be so valueless as in practical effect to amount to no alternative, and that under such circumstances there would be a "taking", the Company has not brought itself within the beneficence of any such rule. No facts are shown evidencing there would be any less return from the sale of all the Company's walnuts in the states of Washington and Oregon in which they are respectively produced. On the contrary, the Company admits "That the actual consumption of walnuts in Oregon and Washington in bumper crop years is sixty percent of the crop grown in those States, whereas the percentage of walnuts consumed in the State of California as compared with those grown in the State of California is only a small fraction thereof." (Tr. 81, 82)

It is entirely possible that so many of the walnut packers in Oregon and Washington do comply with the regulation, 100 percent of whose shipments would be taken out of intrastate commerce, that there would be sufficient consumptive demand within these states to purchase at profitable prices the unshipped walnuts of the Company and its competitors.

The Company cites the case of Thompson v. Consolidated Gas Utilities Corp., 300 U.S. 55, 57 S.Ct. 364, 81 L.Ed. 510. The cited case is disinguishable from the case at bar. In that case, the court concluded that the purpose and effect of the regulation was not to minimize the wastage of the natural resources of Texas in oil and gas but "* * * to compel those who may legally produce, because they have market outlets [through their privately owned pipelines] for permitted uses, to purchase gas from potential producers whom the statute prohibits from producing because they lack such a market for their possible product." [Page 374.] The court concluded, from *evidence* introduced, that the purpose of the regulation there imposed was not to eliminate any economic evil whatsoever, much less the evil here admitted to exist and to be ameliorated by the Secretary's Order. Moreover, not only did the court find that the purpose of the regulation was not legitimate, but also that there was substantially no local market for the only use of gas not prohibited by statute. As stated, here no facts were introduced evidencing that the Company would be unable to dispose of its walnuts intrastate.

Even if the Company were able to show (which it has not done) that the only alternative to making delivery to the Control Board of surplus walnuts or their "credit value", would be to go out of business, the type of regulation here involved finds supporting analogies in such cases as Noble State Bank v. Haskell, 219 U.S. 104, 31 S.Ct. 186, 55 L.Ed. 112, 32 L.R.A.,N.S., 1062, Ann.Cas.1912A, 487; Id., 219 U.S. 575, 31 S.Ct. 299, 55 L.Ed. 341, where, for the benefit of a group of competing banks and their depositors, each is required to contribute to a public official 5 percent of its average daily deposits to protect any in the group from insolvency; and Mountain Timber Co. v. Washington, 243 U.S. 219, 37 S.Ct. 260, 61 L.Ed. 685, Ann.Cas.1917D, 642, where each in a group of competing manufacturers is required to contribute also to a public officer periodic payments for the compensation of the employees of each for personal injuries.

In each case the alternative escape from contributing is retirement from the business. In each of these cases, as here with the walnut packer, the individual's property contributed may not be compensated for by return to him of as much as the contribution. Some contributors may receive back much more than has been given. Some may have no return whatsoever.

Moreover, if the regulation had amounted to a "taking", it would be unlike that in the Thompson Case, supra, page 80, 57 S.Ct. page 376. It would not be a taking "for the benefit of another private person without a justifying public purpose", which Mr. Justice Brandeis' opinion states is prohibited even if compensation is paid. Here the regulation is for immediate and direct private benefit, but also for a justifying public purpose found by Congress. It has compensatory benefits to a large group of private individuals, by restoring the lack of parity in price for their products, declared by the statute and held by us to have an evil effect on the country as a whole.

**II. The Company has failed to establish a deprivation of liberty or property in violation of the due process clause of the Fifth Amendment.**

The power to regulate interstate commerce includes the power to prohibit absolutely interstate shipment. Kentucky Whip & Collar Co. v. Illinois Cent. R. Co., 299 U.S. 334, 346, 57 S.Ct. 277, 279, 81 L.Ed. 270, and cases there cited. This is true even though the goods prohibited from interstate shipment are themselves of a harmless character. As is said in Kentucky Whip & Collar Co. v. Illinois Cent. R. Co., supra, pages 347, 348, 57 S.Ct. page 281: "The contention is inadmissible that the Act of Congress is invalid merely because the horse collars and harness which petitioner manufactures and sells are useful and harmless articles." If Congress can prohibit absolutely interstate shipment of such merchandise, a fortiori it has the power to prohibit conditionally. The prohibition involved in the case at bar, as already demonstrated, is conditional.

Even if the prohibition imposed in the exercise of the commerce power results in the destruction of property rights or of the liberty to contract or engage in business, there is no deprivation in violation of the due process clause of the Fifth Amendment unless the regulation imposed is unreasonable.

There is no proof of any outstanding contracts in the performance of which the Company will be frustrated by the Order and thereby be deprived of its property in the contracts. And even if there were a frustration of contracts amounting to a destruction of the Company's property in them, Congress may do this in regulating interstate commerce within the area of its police power. As was said by Mr. Justice Cardozo in Holyoke Water Power Co. v. American Writing Paper Co., 300 U.S. 324, at page 341, 57 S.Ct. 485, at page 490, 81 L.Ed. 678: "But the disappointment of expectations and even the frustration of contracts may be a lawful exercise of power when expectation and contract are in conflict with the public welfare. 'Contracts may create rights of property, but, when contracts deal with a subject-matter which lies within the control of the Congress, they have a congenital infirmity.' Norman v. Baltimore & Ohio R. Co., supra, 294 U.S. 240, at pages 307, 308, 55 S.Ct. 407, 416, 79 L.Ed. 885, 95 A.L.R. 1352. To that congenital infirmity this covenant succumbs."

In Norman v. Baltimore & Ohio R. Co., supra, 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885, 95 A.L.R. 1352, the "congenital infirmity" of the contract adjudicated arose from the federal power over the currency; the commerce power over the Company's interstate shipments equally may be regarded as the source of such infirmity in the Company's business anticipations.

As in the case of destruction of property in contracts, the questions whether there is here, in violation of the due process clause, deprivation of some major incident in the property in walnuts, or deprivation of liberty to engage in the interstate walnut business, must be answered in the negative if the means adopted in the exercise of the commerce power are reasonable.

"The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall

not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. It results that a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances, because the reasonableness of each regulation depends upon the relevant facts." Nebbia v. New York, 291 U.S. 502, 525, 54 S.Ct. 505, 510, 78 L.Ed. 940, 89 A.L.R. 1469.

██ Here the Company is met with its admission that the Order does reasonably effectuate the purpose of the Act to ameliorate the declared disparity of purchasing power. It is obviously not arbitrarily discriminatory between the various packers. The reasonableness conceded applies to both alternatives; that is, to selling the walnuts produced in the states of Oregon and of Washington respectively within those states, and to the limitation of shipments in interstate commerce with the disposition of the surplus through the Control Board.

Even if the reasonableness of the regulation had not been conceded, in the absence of any evidence to the contrary we would be required to hold that the Company has not overcome the presumption that there is a rational basis in conceivable fact to sustain the Secretary's Order. Pacific States Box & Basket Co. v. White, 296 U.S. 176, 185, 186, 56 S.Ct. 159, 163, 80 L.Ed. 138, 101 A.L.R. 853.

There is no merit to the Company's contention that any regulation other than a mere quota restriction is unreasonable. It may well be that the control of the surplus through the Board, which could feed it gradually into an increasing demand for walnuts, better would attain the price parity and maintain reasonable prices than a mere provision for limited quota shipments, with all the remainder retained in the hands of packers or producers.

Since we find the conditional requirement of the delivery of walnuts to the Board within the power of Congress and the Secretary, the fact that in attaining price parity, it may be deemed necessary to give some or all the surplus to indigent persons, does not make the requirement unlawful. It cannot be said that such a disposition has no reasonable relation to the lawful objective of the Agricultural Adjustment Act. It may be argued that in an attempt to prevent the so-called depressions of abundance referred to in Edwards v. United States, 9 Cir., 91 F.2d 767, at page 784, Congress will seek to expand the exercise of a power to give away surplus; that the precedent may lead to far-reaching legislation to distribute, to those who need but do not have, both the surplus of the enormous production given by scientific enlightenment to agriculture and that given by both science and invention to the machine. Whether there is basis for such argument does not concern the disposition of this case. It is sufficient that we find the existence of legislative power for the regulation here challenged.

The Supreme Court, in the recent case of National Labor Relations Board v. Pacific Greyhound Lines, Inc., 303 U.S. 272, 58 S.Ct. 577, 82 L.Ed. 838, has reversed the holding of this court denying the Labor Board the right to destroy by disestablishment, a labor union, in a proceeding brought by the National Labor Relations Board against, not the union, but what the Board's complaint alleges is its enemy, the union's employer, and to which proceeding the union was not made a party. The labor union, an association of human persons, has received legislative recognition and protection both from the Congress and many of the state legislatures. Obviously, it is a more human personality than the corporation appellee. If to prevent interference with the volume of interstate goods "to be transported" (National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 42, 57 S.Ct. 615, 626, 81 L.Ed. 893, 108 A.L.R. 1352) the police power may cause the death of the union, in a proceeding to which it is not a party but between parties of declared antagonism to the union, and yet not be deemed to deprive it of its life and liberty in violation of due process, a fortiori the regulation here, admittedly relieving or removing a mere economic evil in interstate commerce, is not such deprivation.

The Company urges that the purpose of the Act and Order is to raise the price for all walnuts sold in interstate commerce from the three states and that the Order utilizes price fixing both in the "credit value" required to be paid as consideration for the Company's privilege of selling all

its interstate orders and in the sale of walnuts delivered to the Board. It contends that, however much the economic evil to be lessened or removed may be within the police power of Congress, the Congress cannot avail itself of the implement of price fixing because it violates the due process clause of the Fifth Amendment.

That price fixing stands on the same basis as other regulation in the exercise of the state police power and that the states have this implement to remedy economic evil in intrastate production and consumption now is clearly established. Nebbia v. New York, supra, page 531 et seq., 54 S.Ct. page 513 et seq.

In Edwards v. U. S., 9 Cir., 91 F.2d 767, 783 et seq. of the opinion, we have gathered the cases establishing that the Congress, in regulating interstate commerce, has a "police power, for the benefit of the public;" that it may be exercised to prevent the economic harm of the lack of price parity of farm and manufactured products which the Agricultural Adjustment Act aims to ameliorate; and that the power of Congress over interstate commerce is as plenary as that of the state legislatures in their exercise of powers reserved to the states.

Price fixing, when employed by Congress, as well as when employed by the state legislatures, is guaged by the same standard as other regulation in the exercise of governmental powers, namely, the standard of reasonableness.

III. Congress, in the exercise of its police power in the field of interstate commerce, may regulate intrastate commerce in walnuts where, as here, such regulation bears a reasonable relation to the prevention of an economic evil in the interstate walnut trade.

In Edwards v. U. S., supra, pages 780-783, we have gathered the cases establishing that the Congressional police power regulating interstate commerce to attain the price parity sought by the Act is not prevented by the Constitution from the incidental regulation of intrastate activities.

In The Shreveport Case, Houston, E. & W. T. Ry. Co. v. U. S., 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341, the freight rates of merchandise carried entirely intrastate, because affecting the rates of interstate carriage, were specifically prescribed by regulation of the Interstate Commerce Commission.

In National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, the regulation of the labor dispute was in *intrastate* production *before* the products to be shipped even had been manufactured. It was the *intention* to ship them when *thereafter* fully manufactured which warranted the regulation of their intrastate production. The finding by the Court of the percentages of shipment of goods in interstate commerce, *prior to the labor disputes,* is relevant only to prove the *intent* so to ship the goods whose manufacture the dispute interfered with or prevented.

Certainly the regulation of intrastate rates and labor relations in intrastate production in these last two cases is no less than is the control provided for in the instant case.

The Company relies on our holding in National Labor Relations Board v. Santa Cruz Fruit Packing Co., 9 Cir., 91 F.2d 790, 795, that, because the employees of the Seabright plant of the employer were not shown to be engaged in packing fruit intended to be shipped in interstate commerce, the Congress had no power to regulate disputes between them and their employer. Here, however, the Company's pleadings admit it is in the interstate walnut business and the claimed unlawfulness of the Order is its interference with its intended interstate shipments.

The Company contends that because some of the walnuts delivered to the Board may remain within the state, say, by delivery to one of the state's charitable institutions, the regulation is of intrastate commerce for which there is no finding of fact for its necessity. This and all the other effects on intrastate commerce are merely incidental to the prevention of the interstate shipment of the surplus, adequately found by the Secretary to have its destructive effect on the desired price parity.

We hold the Secretary's Order is lawful even though, as an incident to its cure of the evil of price disparity in interstate commerce in walnuts, it also regulates the Company's intrastate walnut business.

**IV.** The Act provides proper standards for the exercise of the Secretary's administrative power in making the Order.

The Company's brief makes the bald statement that the Act contains no standards to control the Secretary's power in making the Order. The brief violates paragraphs 3 and 2 (e) of Rule 24 of this court which require it to give a clear "statement of the points of law or fact to be discussed, with a reference to the pages of the record and the authorities relied upon in support of each point", and we could deem the point waived. The contention is decided adversely to the Company in Edwards v. United States, 9 Cir., 91 F.2d 767, at page 785 et seq.

The Order and provisions of the Agricultural Adjustment Act authorizing it are lawful. The Company is held subject to the Order and the decree exempting it from its operation is reversed.

Reversed.

MATHEWS, Circuit Judge, dissents.