GAY UNION CORPORATION, Inc., v.
WALLACE, Sec. of Agriculture.

CANAL BANK & TRUST CO. v. SAME.
Nos. 7402, 7403.

United States Court of Appeals for the
District of Columbia.

Decided Feb. 26, 1940.

Writ of Certiorari Denied June 3, 1940.
See 60 S.Ct. 1098, 84 L.Ed. ——.

GRONER, Chief Justice, dissenting in part.

———————

K. Thomas Everngam and Horace S. Whitman, both of Washington, D. C., and Leonard B. Levy, of New Orleans, La., for appellants.

John S. L. Yost and W. Carroll Hunter, Sp. Assts. to Atty. Gen., for appellee.

Before GRONER, Chief Justice, and MILLER and VINSON, Associate Justices.

VINSON, Associate Justice.

These two cases are appeals, under § 205 (b) of the Sugar Act of 1937,[1] from a decision of the Secretary of Agriculture denying to appellants any allotment of the 1939 mainland cane sugar quota. The Act requires the Secretary annually to determine the amount of sugar needed to meet the requirements of consumers in the continental United States. § 201. It apportions this amount among domestic and foreign areas of supply. § 202. Once the quota for any area is filled, no more sugar from that source may be marketed in the United States during the quota period. § 209(a) (b). Under certain conditions, the Secretary is required to make allotments of any area's quota to persons who market or import sugar in the continental

United States for consumption therein, § 205(a), and thereafter no such person may exceed his allotment. § 209(d). The basis for the determination of individual allotments is that they "shall be made in such manner and in such amounts as to provide a fair, efficient, and equitable distribution of such quota". § 205(a).

Under Title III, §§ 301–307, the area's quota is likewise allotted among farms, and benefit payments are made on condition that the farmer has not marketed in excess of the "proportionate share" for his farm. The only relevancy of this provision is that processings of sugar from these proportionate shares constitute one of the three factors that may be considered in allotting the marketing quota for manufactured sugar.

For the year 1939 the Secretary set a quota of 424,727 tons for the mainland cane sugar area (Louisiana and Florida), and this quota was allotted among 69 processors. Appellants were denied any participation in the allotment. The Act gives to any person whose application for an allotment has been denied a right to appeal to this court within twenty days. § 205(b). The decision sought here to be reviewed was made April 28, 1939, and notwithstanding the appeal was filed in time and prosecuted with vigor, the cause was not ready for hearing until about thirty days before the end of the year.

Appellants are Gay Union Corporation, Inc., and Canal Bank & Trust Company (in liquidation). Gay Union owns four sugar plantations located in Louisiana with a factory located on one of them. Although the factory has not operated since 1928, it is claimed that it has been "maintained intact". The factory allegedly has a twenty-four hour processing capacity of 800 tons of sugarcane and, in its application for an allotment, Gay Union stated that a survey made in 1938 indicated that about 30,000 to 35,000 tons of sugarcane were available for processing at their factory. Without an allotment it is claimed that the factory is valueless, on the theory that operations could not safely be commenced without assurance of a right to market the product.

Canal Bank likewise owns a plantation and a sugar factory located in Louisiana. No sugar has been processed since 1929, but Canal Bank claims that the factory has

———————

[1] 50 Stat. 903, 7 U.S.C.A. 1100–1183.

been "maintained intact" and "can be placed in operation on short notice and in good condition". The factory allegedly has a twenty-four hour processing capacity of 600 tons, and it is claimed that a canvass by disinterested parties in 1938 indicated that 45,000 to 50,000 tons of sugarcane (including plantation grown cane) were available for it. Canal Bank also claims that, without an allotment, its factory is worthless and that two opportunities to sell, for operation, one in 1937 and the other in 1938, were lost because of lack of assurance of an allotment. It should be noted that the allotment provisions were not invoked until 1939.

. On January 18, 1939, pursuant to the provisions of § 205(a)[2] the Secretary found that allotment of the mainland cane sugar quota was necessary "to prevent disorderly marketing of such sugar and to afford all interested persons an equitable opportunity to market such sugar in the continental United States * * *".[3] Public notice was given of a hearing on the subject of allotments to be held in Mobile, Alabama, on February 8, 1939. The meeting was largely attended by processors. Apparently the regulations do not require an applicant to file a petition asking for an allotment. Instead, the discussion, as we gather from the record, consists largely of suggestions how the quota shall be allotted. Witnesses are heard, and the matter is then considered and determined by the Secretary on the recommendation of his examiners.

In the present instance, the Sugar Division of the Department proposed that the basis of allotment should be past marketings of sugar and processing of sugarcane to which proportionate shares pertained, and that equal weight be given them. Several other allotment formulae were submitted at the hearing by the processors, including a proposal that processings from proportionate shares should be given three-fourths weight. After the hearing, the Secretary determined to give three-fourths weight to processings from proportionate shares and one-fourth weight to past marketings in order to protect producers of sugarcane. Processings were measured by the processings from proportionate shares of the 1938-39 crop, while past marketings were measured by specified averages of marketings during the four calendar years, 1935-6-7-8. If appellants had been engaged in processing or in the marketing of sugar during the respective years they would have received an allotment. But since they were not engaged in either during any of the years mentioned they were excluded. In reaching the result announced, the Secretary expressly considered only two of the three factors contained in the Act, and omitted from express consideration the third, namely present ability to market. The appellants claim that if the Secretary had considered ability to market or past marketings prior to 1929, they would have received allotments. The view of the Secretary is that Congress intended these factors

[2] "sec. 205 [§ 1115.] (a) Whenever the Secretary finds that the allotment of any quota, or proration thereof, established for any area pursuant to the provisions of this Act [chapter], is necessary to assure an orderly and adequate flow of sugar or liquid sugar in the channels of interstate or foreign commerce, or to prevent disorderly marketing or importation of sugar or liquid sugar, or to maintain a continuous and stable supply of sugar or liquid sugar, or to afford all interested persons an equitable opportunity to market sugar or liquid sugar within any area's quota, after such hearing and upon such notice as he may by regulations prescribe, he shall make allotments of such quota or proration thereof by allotting to persons who market or import sugar or liquid sugar, for such periods as he may designate, the quantities of sugar or liquid sugar which each such person may market in continental United States, the Territory of Hawaii, or Puerto Rico, or may import or bring into continental United States, for consumption therein. Allotments shall be made in such manner and in such amounts as to provide a fair, efficient, and equitable distribution of such quota or proration thereof, by taking into consideration the processings of sugar or liquid sugar from sugar beets or sugarcane to which proportionate shares, determined pursuant to the provisions of subsection (b) of section 302 [1132], pertained; the past marketings of each such person; or the ability of such person to market or import that portion of such quota or proration thereof allotted to him. The Secretary may also, upon such hearing and notice as he may by regulations prescribe, revise or amend any such allotment upon the same basis as the initial allotment was made." 50 Stat. 903, 905, 7 U.S.C.A. § 1115(a).

[3] 4 Fed.Reg. 384.

to be considered singly or in combination, as he in his discretion believed to be proper. On the other hand, appellants insist that Congress expressly provided in the Act that the Secretary was to use all three standards and that the result of the act of the Secretary was to deprive appellants of their property without due process of law in contravention of the Fifth Amendment of the Constitution, and also to create a monopoly in violation of the Sherman and Clayton Anti-trust Acts, 15 U.S.C.A. § 1 et seq.

■ The Government raises a preliminary issue, which we shall consider first. It is the contention that the case is moot. The ground of this is that on September 11, 1939, shortly after the outbreak of war in Europe, the President suspended the provisions of Title II of the Sugar Act,[4] and that this had the effect of removing the restrictions on the marketing of sugar. The result, the Secretary says, was to grant appellants as great, if not greater relief than any which could possibly be granted by an order in this proceeding. Doubtless this is true so far as concerns any relief which this court can afford appellants with relation to an allotment for the year 1939. But while the case was under consideration by us, the President revoked his earlier suspension,[5] and the Secretary has now reinstated his regulations governing notice and hearings to establish new allotments,[6] and we take judicial notice of the fact that by an order dated January 13, 1940, he has fixed the 1940 quota, in substantially the same amount, for each area[7] and individual allotments may follow. From this, it seems not unlikely that the order complained of may be replaced by another of substantially similar import and that appellants, in the current year, will find themselves in the same position as in the preceding year, since, in the very nature of things, it will be again impossible to secure a court review and obtain a decision before the end of the allotment period.

We are clear that this brings the case under the rule announced in Southern Pacific Terminal Co. v. Interstate Commerce Comm., 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310. There the Supreme Court said, in answer to the defense that the order appealed from had expired, that sometimes a different conclusive factor is shown. In that case it was held that expiration of the order of the Interstate Commerce Commission did not make the case moot. "The questions involved in the orders of the Interstate Commerce Commission are usually continuing (as are manifestly those in the case at bar), and these considerations ought not to be, as they might be, defeated, by short-terms orders, capable of repetition, yet evading review, and at one time the government, and at another time the carriers, have their rights determined by the Commission without a chance of redress."

In Boise City Irr. & L. Co. v. Clark, 131 F. 415, the Ninth Circuit Court of Appeals, on a similar state of facts, said a case was never moot in a situation in which there is the necessity of deciding a question of law to serve as a guide to the body called upon to act again in the same matter. And to the same effect, see United States v. Trans. M. O. Freight, 166 U.S. 290, 308, 17 S.Ct. 540, 41 L.Ed. 1007; and see also Federal Trade Com. v. Goodyear Tire & R. Co., 304 U.S. 257, 58 S.Ct. 863, 82 L.Ed. 1326, and Panama Ref. Co. v. Ryan, 293 U.S. 388, 413, 414, 55 S.Ct. 241, 79 L.Ed. 446, where the rule announced in the Southern Pacific Terminal case is reaffirmed.

In the present case it is clear that the statute was intended to give an aggrieved person a remedy by appeal to this court, but it is equally clear that after the Secretary has announced his decision, the time for appeal is wholly inadequate for any effective relief. And it is also true that, unless the rights of the parties under the regulation complained of are determined, the result in the present year will be again to leave appellants without remedy. We think, in these circumstances, that even though we are without power to grant the specific relief prayed, our duty is to determine the question presented.

We turn now to a consideration of the question whether the Act authorizes the Secretary to deny a marketing allotment to appellants whose sugar factories have not operated in the preceding decade.

■ The Sugar Act was enacted for the "purpose of providing for the stabilization

---

[4] Fed.Reg. 3889. Under the authority of § 509, 50 Stat. 916, 7 U.S.C.A. § 1179.

[5] 4 Fed.Reg. 4941.

[6] 5 Fed.Reg. 58-9.

[7] 5 Fed.Reg. 194-5.

of the sugar producing, refining, and importing industries".[8]  To that end it sets up the sugar quota system whereby the supply of sugar available to the market may be regulated. If it were doubtful that a statute was intended to restrict otherwise legitimate business activity the courts should be reluctant to give it that interpretation. It is clear, however, that the very foundation stone of the Sugar Act is the prohibition or restriction of otherwise legitimate economic activity— the marketing of sugar beyond the amount of the quota.[9]  It is equally clear that the Act imposes no restrictions on production or processing. The restrictions imposed relate only to the marketing of the product. The constitutionality of such a regulatory statute we deem to have been settled by the Supreme Court in Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441; Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092; and United States v. Rock Royal Co-op. Inc., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446. It follows that the court in construing the Act must give full application to the language contained therein.

Under § 205(a) of the Act, the Secretary is directed in a variety of circumstances[10] to make allotments of the sugar quota for the United States, Hawaii, or Puerto Rico "to persons who market"[11] sugar so as to provide a "fair, efficient, and equitable distribution of such quota * * * by taking into consideration [1]

the processings of sugar * * * from * * * sugarcane to which proportionate shares * * * pertained; [2]  the past marketings * * *; or [3]  the ability * * * to market * * *". Consideration of this last standard would tend to insure allotments to such new and long idle mills as could establish to the satisfaction of the Secretary that they possessed actual "ability to market". The appellants contend that it must be so considered. This third standard, ability to market, is preceded, however, by the word "or". Since each of the three factors is complete in itself, "or" merits its normal disjunctive meaning, i. e., introductive of an alternative standard. Thus, the third standard, ability to market, is an alternative to be invoked at the Secretary's discretion in securing that fair, *efficient,* and equitable distribution of the quota commanded of him by Congress. Certain other aspects of the Act make it clear beyond doubt that this language must be so interpreted.

The Secretary is authorized to invoke the allotment provisions in several divergent circumstances in the United States, Hawaii, or Puerto Rico, and allotments in all instances must afford a "fair, efficient, and equitable distribution" of the quota. The appearance of the word "or" preceding the third standard serves to confirm the reasonable expectation that Congress would afford the Secretary a considerable measure of discretion in applying the allotment provisions to variant situations.[12]  The

---

8 H.Rep. No. 1179, 75 Cong. 1st Sess. The Title of the Act reads as follows: "To regulate commerce among the several States, with the Territories and possessions of the United States, and with foreign countries; to protect the welfare of consumers of sugars and of those engaged in the domestic sugar-producing industry; to promote the export trade of the United States; to raise revenue; and for other purposes". 50 Stat. 903.

9 Sec. 209 (b), 50 Stat. 908, 7 U.S.C.A. § 1119(b).

10 See note 2 supra.

11 The statutory direction to allot "to persons who market" might suggest that the Secretary is limited in making allotments to those engaged in marketing at the time the allotment provisions are first invoked. Such a construction seems unwarranted in view of other provisions of § 205 (a). Under this section the Secretary is authorized to invoke the allotment provisions "to assure an orderly

and adequate flow of sugar * * * in the channels of interstate or foreign commerce * * * or to afford all interested persons an equitable opportunity to market sugar * * *". In making allotments the Secretary may consider "ability to market". It would thus appear that the Secretary is authorized to make allotments to new or long idle factories when circumstances require it in the interests of a "fair, efficient, and equitable distribution" of the quota. Hence, the phrase "persons who market", as it appears in § 205 (a), must be interpreted as simply descriptive of persons who can market sugar in the period for which the allotment is to be made.

12 The necessity for a considerable measure of discretion in the administration of allotments in different areas in varying circumstances is illustrated by the Secretary's administration of § 205 (a) in Puerto Rico. Allotments have been made to processors there in respect to (1) the general quota of sugar which

very nature of the three standards also suggests that the factor "ability to market" is a discretionary one. Recent processings and past marketings are items that may be accurately ascertained. Moreover, they evidence an actual ability to market. A hypothetical ability to market based on mill capacity and like statistics could, in most instances, give little assistance to the Secretary in making actual marketing allotments affording a "fair, *efficient,* and equitable distribution" of the quota protective of the interests of consumers and growers. Since it would only be in unusual circumstances that consideration of a hypothetical "ability to market" could assist the Secretary in making allotments, express consideration of this standard should rest within his discretion.

It is significant to note that in respect to allotments of proportionate shares to *growers* § 302 provides that "the Secretary may take into consideration [1] the past production * * * *and* [2] sugarcane marketed * * * *and* [3] the ability to produce * * *, *and* the Secretary shall, insofar as practicable, protect the interests of new producers * * *".[13] (Italics supplied.) Carefully restricted protection for new producers has been affirmatively given in other agricultural acts.[14] In contrast, § 205(a) directs the Secretary in making allotments to processors, to consider "[1] the processings of sugar * * *; [2] the past marketings * * *; *or* [3] the ability * * * to market * * *". (Italics supplied.)

We are of the opinion that the third standard, ability to market, is an alternative to be invoked at the discretion of the Secretary in securing that fair, *efficient,* and equitable distribution of the quota commanded of him by Congress, and it must be so construed unless such construction is inconsistent with other provisions of the Act.[15] The only provisions of the act that need be considered in respect to this are also found in § 205(a). The Secretary is thereunder authorized to invoke the allotment provisions in order "to afford all interested persons an equitable opportunity to market sugar", and the governing standard in respect to all allotments is the requirement that they provide a "fair,

the island processors can sell in the continental United States; (2) the part of the general quota that may be filled by direct-consumption sugar; and (3) the quota of sugar for local consumption in Puerto Rico.

In making allotments of the general quota, (excluding direct-consumption sugar) and the quota for local Puerto Rico consumption, the Secretary based the allotments on processings from proportionate shares. Use of this single standard he deemed necessary in order to have a "fair, efficient, and equitable distribution" of the quota that would adequately protect the growers. (P.R.S.O. No. 12, 3 Fed.Reg. 1174.)

In allotting that part of the general quota that may be filled by direct-consumption sugar the standards used were (a) past marketings, and (b) ability to market. Processings from proportionate shares were regarded as inapplicable for the reason that use of this standard "would require the making of allotments to a number of processors in Puerto Rico who are not equipped to produce refined sugar, which constitutes the bulk of direct-consumption sugar." (P.R.S.O. No. 13, 1 Fed.Reg. 97.)

The fact that ability to market was considered by the Secretary in making the direct-consumption sugar allotment of the Puerto Rico quota, far from establishing that the Secretary acted improperly in the instant situation, forcibly demonstrates the necessity for administrative discretion in the execution of § 205 (a).

[13] 50 Stat. 911, 7 U.S.C.A. § 1132.

[14] Bankhead Cotton Act, 48 Stat. 598, 602, § 8 (b), repealed 49 Stat. 1106. Potato Act, 49 Stat. 782, 785, § 206 repealed 49 Stat. 1106. Agricultural Adjustment Act of 1938, 52 Stat. 47, 54, 57, 61, §§ 313 (c), 334 (c), 344 (c) (2), 353 (b), 7 U.S.C.A. §§ 1313 (c), 1334 (c), 1344 (c) (2), 1353 (b).

In the provisions of these statutes cited, a fixed percentage of the quota is set aside for new producers. Beyond that percentage no allotments may be given new producers.

[15] In statutory construction "or" is to be given its normal disjunctive meaning unless such a construction renders the provision in question repugnant to other provisions of the statute. Voight v. Industrial Commission, 297 Ill. 109, 130 N. E. 470; Pompano Horse Club v. Florida, 93 Fla. 415, 111 So. 801, 805, 52 A.L.R. 51; Koch v. Fox, 71 App.Div. 288, 75 N.Y.S. 913, 916. See also Travers v. Reinhardt, 25 App.D.C. 567, affirmed, 205 U.S. 423, 27 S.Ct. 563, 51 L.Ed. 865; Ohio Fuel Supply Co. v. Paxton, D.C., 1 F.2d 662, 664; Note Ann.Cas.1913A, 1059.

efficient, and equitable distribution" of the quota. Thus the question arises whether an allotment formula omitting express consideration of present ability to market is consistent with these other provisions of the Act. It is believed that question may be answered by a consideration of the circumstances under which the Secretary made the allotment order in question.

The appellants' factories have not operated since 1929 and it appears that in the Louisiana area there are a number of other mills similarly situated. Thus a large potential processing and marketing capacity has lain idle for a rather extended period, idleness dictated not by governmental allotments[16] but by various economic considerations. Since the marketing quota allotted in 1939 was appreciably less than the amounts of sugar actually processed by the sixty-nine operating mills in any of the preceding three years,[17] it is clear that allotments to long idle mills would have been made at serious expense to those operating. So applied the Act would have been utilized, not to preserve the living, but to resurrect the dead at the expense of the living. Moreover, it may be doubted whether allotments to long idle mills in this situation would have effected an *efficient* distribution of the quota from the viewpoint of consumers and growers, whose interests are paramount. In the light of the general purpose of the statute to stabilize the sugar industry, and the apparent duplication of processing facilities, we cannot say that allotments on the basis of processings for the previous year and marketings over the previous four year period were inconsistent with a "fair, efficient, and equitable distribution" of the quota, affording an "equitable opportunity" to interested persons to market sugar. It follows that construction of the third standard "ability to market" as an alternative to be invoked at the discretion of the Secretary is consistent with these other provisions of the Act, and, further, that the Secretary did not exercise his discretion in an arbitrary or capricious fashion in omitting express consideration of this standard. Nor can it be said that the Act so construed effects an unconstitutional delegation of legislative power.[18]

We conclude that under § 205(a) the Secretary, in making allotments to provide a "fair, efficient, and equitable distribution" of the quota, is authorized to consider "[1] the processings of sugar * * * from * * * sugarcane to which proportionate shares * * * pertained;-[2] the past marketings * * * ; *or* [3] the ability * * * to market * * * ". (Italics supplied.) In a sound exercise of the discretion thus afforded him, the Secretary, in the instant situation, expressly considered only processings and past marketings in making the allotments. There is no merit in the contention that restricting consideration of past marketings to the preceding four years arbitrarily discriminated against those whose marketing exper-

---

[16] The Jones Costigan Act of May 9, 1934, 48 Stat. 670, 7 U.S.C.A. § 608a, provided for sugar marketing quotas and allotment to processors and importers of such quotas. No allotments were made in respect to the mainland cane sugar quota under that Act, which remained in force until the present Sugar Act was adopted, September 1, 1937, 50 Stat. 903, 7 U.S. C.A. § 1100 et seq. Under the Sugar Act no allotments of the mainland sugar quota were made in 1937 or 1938. The first allotment order ever issued in respect to the mainland cane sugar quota, therefore, was that of 1939, the operation of which was suspended by the Presidential Proclamation of Sept. 13, 1939. 4 Fed.Reg. 3889. Thus the appellants have been free at all times to process and, with the exception of a portion of the year 1939 not the processing season, free to sell all the sugar they wished.

[17] The marketing quota for mainland cane sugar in 1939 was 424,727 short tons, raw value.

Production of mainland cane sugar is tabulated by the Sugar Division of the Department of Agriculture as follows:

| | |
|---|---|
| 1935-36 | 381,405 tons |
| 1936-37 | 436,073 tons |
| 1937-38 | 456,521 tons |
| 1938-39 | 584,633 tons. |

[18] The objectives of the Act are clearly expressed. In furtherance thereof allotments are to be made affording in all instances a "fair, efficient, and equitable distribution" of the quota. Alternative standards for the Secretary's consideration in meeting that general standard are definitely set out. We think no unconstitutional delegation of legislative power is effected by those provisions. Cf. Currin v. Wallace, supra, 306 U.S. at page 16, 17, 59 S.Ct. at page 379, 83 L.Ed. 441; Mulford v. Smith, supra, 307 U.S. at page 48, 49, 59 S.Ct. at page 648, 83 L.Ed. 1092; United States v. Rock Royal Co-op., supra, 307 U.S. at page 574, 59 S.Ct. at page 993, 83 L.Ed. 1446.

ience antedated that period.[19] The appellants were, therefore, properly denied any allotment in 1939.

It may be observed that even if the Act required the Secretary to consider "ability to market" in all cases (which it does not) the appellants would not be entitled to an allotment on the basis of the evidence they adduced preceding the allotment order. In the "regulations Governing Notice and Opportunity for Hearing Concerning Allotment of Quotas * * *"[20], promulgated by the Secretary, it is provided that the normal mode of receiving testimony is to be followed at such hearing but that "Affidavits as to relevant economic facts may be admitted in evidence, but the Secretary, in determining the weight to be given to such affidavits, will consider the lack of opportunity for cross examination". At the hearing Gay Union's representative could produce no indicia of authority evidencing his right to represent the factory, hence no evidence in behalf of Gay Union was introduced at that time. An affidavit was later submitted to the Secretary stating, in behalf of Gay Union, that their factory had a twenty-four hour capacity of 800 tons; that the factory had not operated since 1928 "due largely to economic conditions over which the owners had no control"; that the factory had been maintained intact; that a survey of the cane supply situation indicated that about 30,000 to 35,000 tons of sugarcane were available for processing at the factory, and that the factory should be granted a marketing quota as a protection to the sugarcane growers in its vicinity.

Representatives of Canal Bank appeared at the hearing and offered as evidence in their behalf only an affidavit stating that their plantation in 1928 produced 7,500 tons of sugarcane and could produce 15,000 tons per year; that their factory had a capacity of 600 tons of sugarcane per twenty-four hours; that the factory, though not operated since 1929, "can be placed in operation on short notice"; that it had been maintained with the intention of operating the same at such time as an adequate cane supply was available; and that opportunities in 1937 and 1938 to sell the mill had been lost because no allotment was assured.

These affidavits and briefs filed by both Gay Union and Canal Bank with the Secretary indicate that they regarded physical ability to process as the equivalent of ability to market. For a decade that had not been true in respect to these mills. Actual ability to market involves many factors other than the rated mill capacity.[21] One consideration is the possession of adequate capital, and Canal Bank, owner of its own factory and 51% of the stock in Gay Union and creditor of the latter in an amount exceeding $240,000, is in liquidation. The affidavits filed by the appellants respecting

[19] Consideration of past marketings in making allotments obviously requires that some period of past marketings be selected. Since the allotment invests the recipient with a share of the responsibility for furnishing the consumer with sugar, selection of a recent period commends itself as reasonable. We cannot say that in the instant case use of marketings over the previous four year period constituted an arbitrary selection of a date to which economic significance attached. Cf. Borden's Co. v. Ten Eyck, 297 U.S. 251, 56 S.Ct. 453, 80 L.Ed. 669; Currin v. Wallace, supra, 306 U.S. at page 14, 59 S.Ct. at page 379, 83 L.Ed. 441. If a period of past marketings so remote that it would bear no reasonable relation to the present marketing situation was selected, such a selection might effect an arbitrary discrimination that would fall before the Fifth Amendment. Cf. Mayflower Farms' Inc. v. Ten Eyck, 297 U.S. 266, 56 S.Ct. 457, 80 L.Ed. 675. That is not the case here.

[20] 2 Fed.Reg. 2068.

[21] When the Secretary considered ability to market in making an allotment in Puerto Rico, supra note 12, he refused to consider mill capacity alone. In P.R.S.O. No. 10, 3 Fed.Reg. 786, 787, he stated that mill capacity alone "represents only a potential ability to produce sugar, dependent upon a number of other factors, such as the availability of raw sugar, the price of raw materials, transportation costs, and similar factors". He then decided that the ratios of each processor's *current* marketings of sugar to the total of such marketings for all processors should be considered and given equal weight with mill capacity. Later it was determined to give refining capacity, as ascertained from *actual performance* for a representative period rather than by mere rated mill capacity, a weight of three-fourths. The quantity currently marketed was given a weight of one-fourth. (P.R.S.O. No. 13, 4 Fed.Reg. 97.)

It is stated in the Government's brief that thus far the Secretary has in no case made an allotment to a processor **not** currently engaged in processing.

their ability to market failed to set forth sufficient facts to indicate that they could process and market an allotment if one was given them. Indeed, no direct statement is made that they intend to do so. It must not be overlooked that these appellants have been free to process and market sugar through every year up to 1939 and yet failed to do so. A natural conclusion under these circumstances, and one not inconsistent with statements made in appellant's briefs and affidavits, is that they are interested in securing allotments merely to give sale value to their property. On this record it would have been difficult indeed for the Secretary to have found that the appellants had such ability to market as would justify investing them with a share of the responsibility for supplying the consumer with sugar.

Finally, it should be pointed out that absence of a marketing allotment does not legally prohibit the appellants from processing sugar. True, under an allotment system, they cannot market their product in the year of its production, but the appellee concedes that on the basis of that production, they would be entitled to a marketing allotment for the next year. Other processors are forced to carry over large inventories, hence there is little injustice in requiring those in the appellants' position to do likewise.[22] The loss to the appellants occasioned by this sort of regulation is incidental to the larger legislative scheme[23] and gives rise to no constitutional infirmities in the Act in view of the Supreme Court's decisions sustaining similar statutes.[24]

The order of the Secretary denying the appellants an allotment of the 1939 sugar quota was proper.

Affirmed.

GRONER, Chief Justice (dissenting in part).

I regret I am unable to concur in all of the opinion. I am in agreement with the conclusion that recent decisions of the Supreme Court impel a finding that the Sugar Act is constitutional. I likewise agree that the case is not moot, but I dissent from so much of the opinion as holds that "ability to market" is an "alternative" standard as to which Congress has delegated discretion to the Secretary of Agriculture in making marketing allotments. I regard the question as of importance in principle, and for that reason I shall state my views briefly.

The opinion approves the action of the Secretary in adopting only two of the three standards established by the Act and in excluding from consideration the third, namely, present ability to market. Both appellants were denied allotments, not because they failed to make the proper showing of ability to market, but solely because the Secretary had decided to ignore that standard and to make all allotments exclusively on the basis of past records in recent years, a standard under which they could not qualify. In my opinion, Congress intended the Secretary to use all three standards to accomplish the "equitable allotment" provided for in the Act. My reasons are these:

Before the enactment of the Sugar Acts, every citizen had the lawful right to enter the business, to process sugar, and to sell it to the general public. This privilege arose out of the inherent right—the common right—of the citizen to cultivate the ground, to purchase products, or to sell them, to carry on trade, or to maintain himself or his family by free industry. The effect of the 1937 Act, as construed by the Court, is to diminish in some cases

---

[22] In connection with the Puerto Rico allotments, supra notes 12 and 21, it is interesting to observe that the Camuy Sugar Company denied an allotment of the 1938 direct-consumption sugar quota upon the ground that it was not at the time engaged in the manufacture of direct-consumption sugar, received an allotment of the 1939 quota upon a showing that it had since begun the processing of such sugar. (P.R.S.O. No. 11, 3 Fed.Reg. 1077 and P.R.S.O. No. 13, supra.)

[23] Cf. Louisville & Nashville R. Co. v. Mottley, 219 U.S. 467, 31 S.Ct. 265, 55

L.Ed. 297, 34 L.R.A.,N.S., 671; Omnia Commercial Co. v. United States, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773; Wallace v. Hudson-Duncan Co., 9 Cir., 98 F.2d 985.

[24] Currin v. Wallace, supra; Mulford v. Smith, supra; United States v. Rock Royal Co-op. Inc., supra.

Since the Act is constitutional as construed by the Secretary, there is no substance in the contention that the Anti-Trust Acts prohibit the Secretary from executing it. See United States v. Rock Royal Co-op. Inc., supra.

and in other cases to destroy these rights, for it is decided here the Secretary may in his discretion restrict the marketing of sugar in continental United States to *existing* processors unless he chooses to adopt the congressional formula which will admit *the new*. Undoubtedly, world-wide conditions affecting price and marketing of agricultural products have made it desirable that a plan be adopted to bring supply and demand within reasonable relationship to one another, but the establishment of a monopoly, the exclusion of one class in favor of another, the allowance, by authority, to any one class of persons or corporations of the sole right to market a particular agricultural product, whereby other persons are restrained of the freedom or liberty they had before and thus hindered in their lawful business, are so fundamentally opposed to American concepts of liberty as not to be accepted without legal compulsion. The brief for the Secretary naïvely suggests that "the 69 processors who received allotments are not complaining". And this is not surprising, for since the quota was insufficient to give a 100 per cent allotment to all, it is hardly to be expected that those within the favored circle should be anxious to extend its borders to include the rejected. But this does not answer the question, for appellants are being deprived of a right. Even assuming the power to destroy this right, it by no means follows that the general government would exercise it without impelling necessity and without expressing the purpose in language so clear as to leave no manner of doubt. I, therefore, think this interpretation of the statute ought not to have our approval, unless the language makes it plainly obligatory. So far as I know, there has yet been no change in the rule that a statute which limits a common right or limits participation by the citizen in lawful industry is to be strictly construed. The rule was stated by Chief Justice Marshall in these words: "That the consequences are to be considered in expounding laws, where the intent is doubtful, is a principle not to be controverted; but it is also true, that it is a principle which must be applied with caution, and which has a degree of influence dependent on the nature of the case to which it is applied. Where rights are infringed, where fundamental principles are overthrown, where the general system of the laws is departed from, the legislative intention must be expressed with irresistible clearness, to induce a court of justice to suppose a design to effect such objects." United States v. Fisher, 2 Cranch 358, 389, 390, 2 L.Ed. 304.

And the same principle was recognized and applied as late as 1906 in the case of Texas & Pacific Railway v. Abilene Cotton Oil Company, 204 U.S. 426, 437, 27 S.Ct. 350, 354, 51 L.Ed. 553, 9 Ann.Cas. 1075, where the Court said: "* * * a statute will not be construed as taking away a common-law right existing at the date of its enactment, unless that result is imperatively required; that is to say, unless it be found that the pre-existing right is so repugnant to the statute that the survival of such right would in effect deprive the subsequent statute of its efficacy; in other words, render its provisions nugatory". And see, to the same effect, Lewis Sutherland on Statutory Construction, Secs. 542, 546; Commonwealth v. Beck, 187 Mass. 15, 72 N.E. 357; Stamford v. Fisher, 140 N.Y. 187, 35 N.E. 500; State v. Dauben, 99 Ohio St. 406, 124 N.E. 232, 233. In all, the rule is recognized that statutes "which restrain the exercise of any trade or occupation, or the conduct of any lawful business, or which impose restrictions upon the use, management, control, or alienation of private property, will be strictly construed", and will not be extended to include restraints or limitations not clearly prescribed. We ought not, therefore, in reading the Act, to attribute to Congress the adoption of a subtle purpose to subject the property of one citizen to disuse and abandonment for the advantage of another. Considered in this aspect, we think the least that can be said is, that the language of the Act casts doubt on the correctness of the construction. In express words it admonishes the Secretary: "to afford all interested persons an equitable opportunity to market sugar * * * by allotting to persons who market or import sugar * * * in such manner and in such amounts as to provide a fair, efficient, and equitable distribution of such quota or proration thereof, by taking into consideration * * * processings * * * past marketings * * * on the ability * * * to market * * *". 7 U.S.C.A. § 1115.

I am not unmindful of the fact that the Act contains no specific reference to persons *who propose to market* nor sets aside a definite percentage of the quota to new producers, but it seems clear to me that the words—fair, efficient, and equitable—

taken in their ordinary meaning, contemplate no deadline at which new enterprise is halted. Moreover, such an absolute prohibition is, I think, inconsistent with the recent congressional agricultural marketing program as embodied in the Bankhead Cotton Act, 48 Stat. 598, [1] the Potato Act of 1935, 49 Stat. 782,[2] and the Agricultural Adjustment Act of 1938, 52 Stat. 31, 7 U.S.C.A. § 1281 et seq. The purpose in these laws, as is true of the sugar law, was to limit production and sale of agricultural products within the probable consumer demand, and to this end to allot to farms an equitable portion of the quota and to penalize sales in excess of the allotment, and the Supreme Court has held this to be a constitutional exercise of congressional power. Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092. But in all the Acts provision is made for allotments to persons on farms not previously used in the production of the particular thing controlled. In the Bankhead Act a fixed percentage of each State's quota was set aside for persons of this class;[3] the same is true of the Potato Act;[4] and in the Agricultural Adjustment Act of 1938 marketing quotas are to be allotted for tobacco, corn, wheat, cotton, and rice to new farmers in these crops;[5] and in the Sugar Act itself the Secretary is required to protect the interests of new producers in so far as practicable in apportioning farm shares under Title III.[6]

Thus, as I think, the agricultural program, considered as a whole, shows the design and purpose of Congress to regard the rights and interests of new producers and, though there is no express reference in the Sugar Act to the part of the quota to be given new processors-marketers, there is the statement of congressional purpose "to afford all interested persons an equitable opportunity to market sugar", and to this end the standard of "ability to market" is set up for application by the Secretary; all of which, I think, indicate the congressional purpose to include newcomers in some equitable division of the whole, and apply the alternative standard where the applicant has no past record in the field, but can show his ability.

So considered, and having regard to the rule of statutory construction which I have discussed, I think it clear that no purpose or intention of Congress is shown to authorize the exclusion of a person solely because he had neither processed nor marketed sugar over a fixed period of time prior to the allotment. I think the contrary is the fair construction of the Act. This construction is consonant with other similar statutes, prevents monopoly, and avoids an absolute prohibition upon new industry where such an intention does not clearly appear in the statute. Cf. United States v. United Verde Copper Co., 196 U.S. 207, 215, 25 S.Ct. 222, 49 L.Ed. 449.

[1] and [2] These Acts were repealed in 1936 (49 Stat. 1106).

[3] Sec. 8(b), 48 Stat. 602.

[4] Sec. 206, 49 Stat. 785.

[5] Secs. 313(c), 329(b), 334(c), 344(c)(2), 353(b), 52 Stat. 47, 52, 54, 57, 61.

[6] Sec. 302(b).