WALLING, Administrator of the Wage and Hour Division, United States Department of Labor, v. MUTUAL WHOLESALE FOOD & SUPPLY CO. et al.

No. 12618.

Circuit Court of Appeals, Eighth Circuit.

March 8, 1944.

334

George B. Searls, Supervising Atty., U. S. Department of Labor, of Washington, D. C. (Douglas B. Maggs, Sol., Irving J. Levy, Associate Sol., Bessie Margolin, Asst. Sol., all of Washington, D. C., James M. Miller, Regional Atty., of Minneapolis, Minn., and Morton Liftin and Morton H. Rowen, Attys., United States Department of Labor, both of Washington, D. C., on the brief), for appellant.

R. H. Fryberger, of Minneapolis, Minn., and George M. Burditt, of Chicago, Ill., for appellees.

Before STONE, THOMAS, and JOHN-SEN, Circuit Judges.

STONE, Circuit Judge.

The Administrator of the Wage and Hour Division of the Department of Labor filed a bill to enjoin alleged violations of Sections 15(a) (2), 15(a) (5) and 11(c) of the Fair Labor Standards Act, 29 U.S. C.A. §§ 215(a) (2, 5) and 211(c), against Mutual Wholesale Food & Supply Co., C. Thomas Stores Sales System (name changed to C. Thomas Stores, Inc.), Merchandise Terminal Warehouse, Lawrence Warehouse Co., and Bailey Food Merchandising Co., all of which were corporations. The violations claimed under § 15 (a) (2) had to do with minimum wages and with maximum hours. The violations of §§ 15(a) (5) and 11(c) concerned keeping of proper records. Answers made the issues of whether the different defendants were engaged in interstate commerce within the meaning of the Act and as what employees were within the Act.

The court filed a painstaking opinion (46 F.Supp. 939), findings of fact and conclusions of law. A decree was entered dismissing as to C. Thomas Stores, Lawrence Warehouse Company and Bailey Food Merchandising Company; granting injunction as to designated classes of employees of Mutual Wholesale Food & Supply Company and Merchandise Terminal Company; denying injunction as to other classes of employees of those two companies, and directing those two companies to make, keep and preserve proper records of employees as required by section 11 of the Act and regulations pursuant thereto.

The Administrator appeals from the conclusion of law excluding the " 'cello' or packaging department" employees of Merchandise Terminal Company; from the exclusion, in the decree, of certain named classes of employees of the Mutual Wholesale Food & Supply Company; and from the dismissal as to C. Thomas Stores and as to Lawrence Warehouse Company.

### Moot Case.

After brief of appellant had been filed, the clerk of this court received a letter from one of counsel for the trustee in bankruptcy of C. Thomas Stores, Inc., stating: that the bankrupt was a merger of C. Thomas Markets, C. Thomas Stores and Mutual Wholesale Food & Supply Company; that "the defendants in the above action [this appeal] have been liquidated in bankruptcy, and as a result the questions at issue are now moot as far as the defendants are concerned;" and that, consequently, no brief would be filed for appellees. In a later letter, such counsel stated these companies "are out of existence for all intents and purposes, although it is true that the corporate shells still remain, and undoubtedly will until their existence ceases by operation of law for no one connected with the corporations are concerned at all about dissolving same." On call of this case, counsel for appellant argued the merits of the appeal and was given leave to file brief on the question of whether the cause had become moot, with leave to counsel for appellees to reply thereto. Such brief has been filed for appellant and counsel for such appellees has indicated that no reply will be filed.

We think the controversy has not become moot so that this appeal should be dismissed. Whatever may have happened to their business, these companies are yet in existence. Ceasing an illegal practice (by going out of business or otherwise), after institution by a public agency of a proceeding to prevent future violations, does not make the controversy moot. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 230, 59 S.Ct.

206, 83 L.Ed. 126; Federal Trade Comm. v. Goodyear Tire & Rubber Co., 304 U.S. 257, 260, 58 S.Ct. 863, 82 L.Ed. 1326; National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58. S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; Southern Pac. Terminal Co. v. Interstate Commerce Commission, 219 U.S. 498, 514–516, 31 S.Ct. 279, 55 L.Ed. 310; United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 307, 17 S.Ct. 540, 41 L.Ed. 1007; Federal Trade Comm. v. Wallace, 8 Cir., 75 F.2d 733, 738. This rule has been applied in suits for injunctions under this Act. Walling v. Haile Gold Mines, 4 Cir., 136 F.2d 102, 105; Fleming v. Cincinnati Union Terminal Co., 6 Cir., 117 F.2d 1012. This rule is reenforced if the situation presents a necessity for decision as a guide to the public agency in future similar matters. Walling v. Haile Gold Mines, supra, 136 F.2d at page 105; Gay Union Corporation v. Wallace, 71 App.D.C. 382, 112 F. 2d 192, 195; Boise City Irr. & L. Co. v. Clark; 9 Cir., 131 F. 415, 418, 419. Further emphasis is placed on this rule where there has been a decision in a lower court which may be used as a precedent in future activities of a public agency. Walling v. Haile Gold Mines, supra, 136 F.2d at page 105, a case under this Act. We proceed to the merits.

### The Merits.

Appellant states the issues on appeal concisely as follows:

"This appeal is from the refusal to hold that all employees of Thomas Stores, Mutual, and Merchandise Terminal whose activities related to the handling of goods after receipt in the warehouse and their distribution from the warehouse to Thomas Stores are within the coverage of the Act and from the dismissal of the complaint as to Lawrence."

These issues are presented under two points: "I. Goods shipped to Mutual's warehouse from outside the State remain in interstate commerce until they reach the Thomas Stores" and "II. Lawrence should be enjoined from violating the Act." In the determination of these issues, it will be useful to state the pertinent rules of law and, in the light thereof, to examine the factual situation to which those rules are to be applied.

As to minimum wages (Title 29 U.S.C.A. § 206), maximum hours (same, § 207) and keeping of records (same, § 211), the statutory scope of the Act is declared to cover each employee "who is engaged in commerce[1] or in the production of goods for commerce." Since none of these companies is producing goods, our concern is with the "engaged in commerce" provision (except as to one matter, later discussed herein, affecting Merchandise Terminal Warehouse).

Under this Act, "it is the work of the employee which is decisive" (McLeod v. Threlkeld, 319 U.S. 491, 497, 63 S.Ct. 1248, 1252, 87 L.Ed. 1538; Overstreet v. North Shore Corporation, 318 U.S. 125, 132, 63 S.Ct. 494, 87 L.Ed. 656; Warren-Bradshaw Drilling Co. v. Hall, 317 U.S. 88, 90, 63 S.Ct. 125, 87 L.Ed. 83; Walling v. Jacksonville Paper Co., 317 U.S. 564, 571, 63 S.Ct. 332, 87 L.Ed. 460; Kirschbaum Co. v. Walling, 316 U.S. 517, 524, 62 S.Ct. 1116, 86 L.Ed. 1638) and the test to be applied to such work "is not whether the employee's activities affect or indirectly relate to interstate commerce but whether they are actually in or so closely related to the movement of the commerce as to be a part of it". McLeod v. Threlkeld, supra, 319 U.S. at page 497, 63 S.Ct. at page 1251, 87 L.Ed. 1538. Such "commerce" extends "throughout the farthest reaches of the channels of interstate commerce" (Overstreet v. North Shore Corporation, 318 U. S. 125, 128, 63 S.Ct. 494, 496, 87 L.Ed. 656; Walling v. Jacksonville Paper Co., 317 U.S. 564, 567, 63 S.Ct. 332, 87 L.Ed. 460) and its presence or absence is determined "by practical considerations." Overstreet v. North Shore Corporation, supra, 318 U.S. at page 128, 63 S.Ct. at page 496, 87 L.Ed. 656; Walling v. Jacksonville Paper Co., supra, 317 U.S. at page 570, 63 S.Ct. at page 336, 87 L.Ed. 460.

While there is no "dependable touchstone by which to determine whether employees are 'engaged in commerce'" (Kirschbaum Co. v. Walling, 316 U.S. 517, 520, 62 S.Ct. 1116, 1118, 86 L.Ed. 1638) but the meaning is to be defined in the applications to cases as they arise by "the gradual process of inclusion and exclusion" (Id., 316 U.S. at page 526, 62 S.Ct. at page 1121, 86 L.Ed. 1638), yet the determination of these "inclusions" and "exclusions" in judicial de-

---

[1] "Commerce" is defined as meaning "trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof" (Title 29 U.S.C.A. § 203).

cision tends to narrow boundaries of inquiry by establishing rules of decision as to certain recurring fact situations—just that is occurring in the definition of "in commerce" as used in this Act. McLeod v. Threlkeld, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538; Overstreet v. North Shore Corporation, 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656; Walling v. Jacksonville Paper Co., 317 U.S. 564, 565, 63 S.Ct. 332, 87 L. Ed. 460; Higgins v. Carr Bros. Co., 317 U.S. 572, 63 S.Ct. 337, 87 L.Ed. 468; Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638; Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682.[2] Through these cases, there is developing definition as to two classes of fact situations: the first deals with employees having to do with the maintenance or operation of instrumentalities of commerce—transportation (the McLeod, Overstreet and Overnight Motor Transportation Co. cases, supra); the second deals with employees of customers of transportation whose duties bring them into touch with interstate shipments. The Jacksonville Paper Co. and Higgins cases, supra. The fact situation here more nearly fits into the second of these classes and, therefore, we are particularly guided by the Jacksonville Paper Co. and Higgins cases. To apply these two cases—as well as pertinent lower court cases—it is necessary to outline the fact situation here.

█ C. Thomas Stores Sales System, Inc. (name later changed to C. Thomas Stores, Inc.) has for years operated a chain of fifty odd retail stores in Minnesota, selling groceries and produce. The predominating control of this and of the other companies here involved (except Lawrence Warehouse Co.) has been and is in Leslie W. Bailey. Prior to 1935, this company bought directly at wholesale the things sold at the stores. For this purpose it maintained headquarters and a warehouse in Minneapolis. From this warehouse, the goods were distributed to the various stores according to their individual needs. Because some manufacturers hesitated to sell wholesale to a chain of retail stores, it was

deemed advisable to form a separate corporation to take over this buying, warehousing and distribution and (January 1, 1935) Mutual Wholesale Food & Supply Company was incorporated. Mutual then took over the warehouse and these functions. It leases space in its warehouse to Lawrence Warehouse Company, to Merchandise Terminal Warehouse, Inc., and office space and equipment for the head operational office of Thomas Stores.

Lawrence is a nation-wide concern engaged in "field warehousing" which is a system devised to facilitate bank borrowing by wholesalers. Under this system, Lawrence acts as pledge holder of warehoused goods to secure loans by banks to wholesalers. This is done by three-party contracts whereunder Lawrence holds possession of goods equalling 133% of the existing loans with rather free privilege in the wholesalers to withdraw and to substitute goods as needed in their business so long as the pledged valuation is maintained. As applied to Mutual, this arrangement took the form of setting apart a definite space in its warehouse—indicated by wire screening and signs—wherein its goods pledged to secure local bank loans were placed in custody of Lawrence. Mutual freely drew from these deposits to fill its daily distributions to the retail stores, depositing substitutions and keeping up the required valuation of goods so placed.

Merchandise Terminal Warehouse, Inc., is a licensed warehouse company controlled by the Bailey interests and was organized as an investment. It leases space in the Mutual warehouse. It acts as warehouseman for Mutual as to certain kinds of goods (principally sugar and other staples) and for various other persons. It acts as consignee for "pool cars"[3] containing freight to Mutual and others. When such cars arrive, the freight belonging to Mutual is placed in its part of the warehouse and the freight of others in the Terminal part where it is held subject to disposition by the owners—much of this incoming freight is interstate and Terminal ships out some interstate on direction of the owners other than Mutual. In addition to its warehouse

[2] A similar occurrence is taking place in the judicial definition of "in the production of goods for commerce" within the Act. Walton v. Southern Package Corporation, 64 S.Ct. 320; Warren-Bradshaw Drilling Co. v. Hall, 317 U. S. 88, 63 S.Ct. 125, 87 L.Ed. 83; Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638.

[3] Pool cars are cars carrying less than car load shipments of several parties which are "pooled" together in the same car for freight purposes.

functions, Terminal maintains a packaging department for the benefit of, Mutual. That is, when goods of Mutual are in bulk and need breakdown into smaller units for the use of the Thomas retail stores, Terminal receives the bulk goods from Mutual and puts them into containers of proper size as directed by Mutual and then returns the packaged articles to Mutual.

Bailey Food Merchandising Company was organized to act and acts in two capacities only—supervision of the four other companies (as well as certain processing and producing concerns furnishing products to Mutual for the Thomas stores) except as to Lawrence, and "as holder of certain trust" (not here pertinent). We are concerned only in the supervisory activities. These functions are managerial and all are executive.

In short, the situation is that of a sizable integrated business setup having as its ultimate purpose retail store sales. It is composed of a chain of retail stores; a concern to buy wholesale the needs for these stores, to assemble and warehouse such and to distribute them to the stores; an independent pledge-holding warehouseman acting in connection with bank borrowings of the business; a warehouseman acting as consignee for the assembly of certain character of shipments and doing certain goods packaging; and a supervisory and managerial unit exercising widely those functions over all but the pledge warehouseman. The boards of directors of Thomas, Mutual, Terminal and Bailey Food are closely interlocked. L. W. Bailey holds stock control of Bailey Food and Bailey Food in turn controls Thomas, Mutual and Terminal.

In addition to what has been stated, the method of carrying on this business will be stated in so far as useful in determining the issues on this appeal.[4]

The issues have to do with whether certain classes of employees (found by the trial court not to be within the Act) were engaged in interstate commerce within the meaning of the Act. Such employees are the office employees of Thomas at its head operating office in Minneapolis; the employees of Mutual who handled merchandise in its warehouse or handled or transported shipments from Mutual to the Thom-

as stores—such office employees as are or when engaged in work connected with transactions having to do with the goods after receipt into the warehouse and warehouse watchmen and maintenance men exclusively engaged in connection with the goods after receipt into the warehouse—; the employees of Terminal who packaged goods for Mutual to send to the Thomas stores; and the employees of Lawrence. None of the employees at the retail stores of Thomas nor the employees of Bailey Food are here involved.

Ninety-five percentum of Mutual business is with Thomas stores and those stores are required by contract to get all of their goods from Mutual. Seventy percentum of Mutual business is with goods coming in to it from other States. Considerable perishable produce and some other items are bought within the State by Mutual. It buys goods on an estimated ten day turnover by the Thomas stores. It furnishes the stores with a catalogue from which the various stores make orders upon it at frequent intervals. It makes prompt truck deliveries to the stores of goods thus ordered, such deliveries being governed by particular situations but usually several times weekly. In the main, these deliveries are from stock in its warehouse and it there makes frequent use of goods pledged with Lawrence. As stated by the manager of Lawrence: "there is a continual flow in and out of the Lawrence stock as the goods are required by Mutual to meet these requirements" (orders of stores upon Mutual). New and seasonal goods go out to the stores without order on a pro rata base determined by Mutual. Perishable produce often moves to the stores directly from the railway cars which bring them in to Mutual. Also, other goods are sometimes taken directly from such cars to fill orders from stores. All goods are sent the stores on consignment and remittances of cash from sales by the stores are made daily to the head operating office of Thomas in the Mutual warehouse building at Minneapolis, along with enclosed orders for goods from the stores. The cash and orders are turned over to Mutual. Mutual does the bank borrowing. Certain warehouse, cartage and other charges are made against goods delivered to the stores by Mutual and it sets the retail prices. "Gross

---

[4] A careful detailed statement may be found in the opinion of the trial court. 46 F. Supp. 939.

profit" is the percentage added by Mutual to cost of merchandise to it and is based on what other wholesalers "throughout the country are in the habit of charging." What is made on gross profit by Mutual is divided between it and Thomas annually. All profit on cartage from Mutual to the stores is returned to them. The warehouse has railway switch and unloading facilities and docks for trucks.

Considering this business setup and method of doing business, it is clear that the great bulk of this business was carried on to meet the needs of one customer (Thomas); that this customer was bound to take goods only from one of these parties (Mutual); that a very substantial portion of the business consisted of interstate shipped goods ordered for and distributed to that customer; and that all of these four companies are useful and used instrumentalities in such business of furnishing these goods to this one customer. In this situation, these interstate shipped goods remain in "the channels of interstate commerce" until they are delivered at the Thomas stores and all employees of any of these four companies who devote substantial parts of their time and efforts to the ordering, receipt, care, and distribution of such interstate goods to Thomas stores are "engaged in commerce" within this Act. This case is governed by Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 335, 87 L.Ed. 460.[5] That case involved the employees of a wholesaler which (as to the issues decided) distributed to its customers in New Jersey from its warehouses in that State goods brought there from other States and countries. The broad issue was whether this pause of the goods in these warehouses broke or ended the interstate journey or whether the goods remained "in commerce" (within the meaning of the Act) until they reached the customer of the wholesaler. Three characters of transactions were involved: (1) goods purchased and brought to the warehouses "on special orders from customers;" (2) goods so purchased and brought to the warehouses "pursuant to a preexisting contract or understanding with the customer;" and (3) goods bought and brought to the warehouses to supply estimated needs for recurrent orders of a fairly stable group of customers. The Court held the stay in the warehouses did not necessarily terminate the interstate journey; that the Act extended "throughout the farthest reaches of the channels of interstate commerce;" and that the "commerce" within this Act continued until the goods reached the customer as to the first and second classes of customers but was not sustained by the evidence as to the third class. As to the third class, the Court stated (317 U.S. at page 570, 63 S.Ct. at page 536, 87 L.Ed. 460): "We do not mean to imply that a wholesaler's course of business based on anticipation of needs of specific customers, rather than on prior orders or contracts, might not at times be sufficient to establish that practical continuity in transit necessary to keep a movement of goods 'in commerce' within the meaning of the Act. * * * We do not believe, however, that on this phase of the case such a course of business is revealed by this record. The evidence said to support it is of a wholly general character and lacks that particularity necessary to show that the goods in question were different from goods acquired and held by a local merchant for local disposition." In the companion case of Higgins v. Carr Brothers Co., 317 U.S. 572, 63 S.Ct. 337, 87 L.Ed. 468, the Court held that, as to an ordinary wholesaler, the interstate journey terminated on receipt of the interstate goods by it and did not extend to the further delivery to its customers. Distinguishing the Jacksonville Paper Co. case, the Court stated (317 U.S. at page 574, 63 S.Ct. at page 338, 87 L.Ed. 468): "Petitioner in his brief describes the business in somewhat greater detail and seeks to show an actual or practical continuity of movement of merchandise from without the state to respondent's regular customers within the state. But here, unlike Walling v. Jacksonville Paper Co., there is nothing in the record before us to support those statements nor to impeach the accuracy of the conclusion of the Supreme Judicial Court of Maine that when the merchandise coming from without the state was unloaded at respondent's place of business its 'interstate movement had ended.'" Since Mutual bought for Thomas stores under con-

---

[5] This case was tried before decision of the Jacksonville Paper Co. case. At the time of trial, much authority in similar cases in the Courts of Appeals was opposed to the doctrine announced later in the Jacksonville Paper Co. case. These earlier cases were relied upon by the trial court and discussed in his painstaking opinion. 46 F.Supp. 939.

tract requiring Thomas to take only from Mutual and since this was one integrated business, Jacksonville Paper Co. decision is controlling here. Some emphasis is added by the situation that the control of Mutual was such that it often determined independently that certain merchandise should go to the Thomas stores. Cases, in Courts of Appeals, involving application of this Act to wholesalers or warehousemen are Allesandro v. C. F. Smith Co., 6 Cir., 136 F.2d 75; Walling v. Silver Bros. Co., 1 Cir., 136 F.2d 168; Walling v. American Stores Co., 3 Cir., 133 F.2d 840; De Loach v. Crowley's, 5 Cir., 128 F.2d 378; Walling v. Goldblatt Bros., 7 Cir., 128 F.2d 778, certiorari denied 318 U.S. 757, 63 S. Ct. 528, 87 L.Ed. 1130; Super-Cold Southwest Co. v. McBride, 5 Cir., 124 F.2d 90; Jax Beer Co. v. Redfern, 5 Cir., 124 F.2d 172; Swift & Co. v. Wilkerson, 5 Cir., 124 F.2d 176; and Jewell Tea Co. v. Williams, 10 Cir., 118 F.2d 202. Some of these cases were determined before the decision in the Jacksonville Paper Co. and Higgins cases.

Since all of these four companies did intrastate business as well, it is necessary to examine as to which employees of each devoted such substantial portion of their time and efforts to this interstate business as to bring them within the Act.

As before stated, the employees of Bailey Food are not involved in this appeal, the evidence being that all of their activities are "executive" (Act, § 13, Title 29 U.S. C.A. § 213(a) (1).

■ As to Thomas, the only employees involved are those in the head operational office at Minneapolis. These employees keep the books of Thomas (as to transactions of separate stores, between the several stores and Mutual and between Thomas and Mutual); receive cash receipts from individual stores and, after checking, turn such over to Mutual in payment of merchandise consigned by Mutual; receive from stores and transmit to Mutual orders for merchandise; and other office duties in connection with above. There is no segregation of work as to interstate or as to intrastate business shown in the evidence. From this sketch of duties of these office employees, it is evident that a substantial portion of their time and work

has to do with the interstate shipments between Mutual and the Thomas stores. They are, therefore, within the Act. Jacksonville Paper case, supra, and Higgins v. Carr Brothers Co., supra, 317 U.S. at page 574, 63 S.Ct. at page 338, 87 L.Ed. 468, and also see Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L. Ed. 1682.

■ As to Mutual. These employees consist of office and warehouse workers and truck drivers. The employees in the office and in the warehouse work daily indiscriminately concerning or with intrastate and interstate merchandise. A substantial part of this work has to do with interstate merchandise. A watchman handles orders (going out to the Thomas stores) as a substantial part of his work and these orders cover interstate as well as intrastate merchandise. There are warehouse maintenance men whose duties are not further described. We hold that all of the above employees are within the Act. Walling v. American Stores Co., 3 Cir., 133 F.2d 840. We are not to be understood as determining generally that all operators of warehouses come within the Act if a substantial part of the goods cared for by them for others are received from, held or sent out (on orders of owners) into interstate commerce. The problem of independent warehousemen is not here involved. We confine our decision to the situation here which is that this warehouse was the wholesale link in an integrated business moving interstate goods from manufacturers or other wholesalers to the stores of a particular contract customer who retailed those goods. It was created to be and was an agency in the course of and to effectuate this movement in interstate commerce within the Act. As to truck drivers, the evidence shows that all of the trucking trips were within the State of Minnesota. Some of the trips were carriage of purely intrastate merchandise [6] while others included or were made up of carriage of interstate merchandise from the Mutual warehouse to the Thomas stores. The evidence here is entirely barren as to whether the same truck drivers handle all of this merchandise indiscriminately or whether certain

---

[6] Some merchandise was bought in Minneapolis from brokers or others after it had ceased its interstate journey and was brought from its resting place to this warehouse in Mutual trucks. Produce (vegetables, butter and eggs) was bought within the State and transported in Mutual trucks to this warehouse and from or to the Thomas stores.

drivers do the intrastate hauling while others do the interstate. We hold that such as do a substantial amount of hauling of interstate merchandise within a week [7] are engaged in interstate commerce (United States v. Erie R. Co., 280 U.S. 98, 50 S.Ct. 51, 74 L.Ed. 187; Baltimore & O. S. W. R. Co. v. Settle, 260 U.S. 166, 43 S.Ct. 28, 67 L.Ed. 189; Phil. & R. R. Co. v. Hancock, 253 U.S. 284, 40 S.Ct. 512, 64 L.Ed. 907) and that any who do not are not. The former would be within this Act were it not for the provisions of section 13(b) (1), 29 U.S.C.A. § 213(b) (1), which exempts "any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of" the Interstate Commerce Act. Section 204(a) (3) of the Motor Carriers Act, Title 49 U.S.C.A. § 304(a) (3), empowers the Commission "to establish for private carriers of property by motor vehicle, if need therefor is found, reasonable requirements to promote safety of operation, and to that end prescribe qualifications and maximum hours of service of employees * * *." These truck drivers come within the power to regulate "to promote safety of operation." Southland Gasoline Co. v. Bayley, 319 U.S. 44, 63 S.Ct. 917, 918, 87 L.Ed. 1244; Richardson v. James Gibbons Co., 4 Cir., 132 F.2d 627, 628; Plunkett v. Abraham Bros. Packing Co., 6 Cir., 129 F.2d 419, 421. Although this exemption applies even when the Commission has not acted under section 204 (Southland Gasoline Co. v. Bayley, supra) yet the situation is here emphasized by the facts that the Commission had so acted when this action was brought and that the relief sought here is in futuro. However, this exemption applies only to maximum hours and not to minimum wages for regular time. The effect upon wages of the exemption is thus confined to overtime. Southland Gasoline Co. v. Bayley, 319 U.S. 44, 48, 63 S.Ct. 917, 87 L.Ed. 1244. Therefore, the Fair Labor Standards Act is applicable only as to minimum wages for regular hours of service in interstate commerce. The result here is that for such weekly periods as any of these drivers were substantially engaged in handling interstate shipments they come within the Act as to minimum wages only and otherwise they are not within the Act.

 As to Terminal. This company employs six or seven persons, of whom five or six are women engaged in the repackaging of merchandise for Mutual and one whose duties include receipt, unloading and placing in Terminal warehouse space of incoming interstate merchandise, notification of arrival and delivery to consignees of such merchandise, loading and shipping of merchandise out of the State on orders of the owners, and correspondence with shippers, consignors, bailors and consignees outside the State. The latter employee is clearly within the Act. The women in the packaging department are also within the Act. The work of these women is entirely repackaging merchandise brought in from outstate by Mutual. This merchandise was bought and shipped in by Mutual for the purpose of distribution to the Thomas stores. Under the meaning of this Act, it remained in the "channels" of interstate commerce until it reached those stores. While one reason for the repackaging was for convenience in retail sales in the stores, another reason may well have had to do with convenience in transportation to those stores. The repackaging occurred while the merchandise was in the channels of interstate commerce and was done in direct connection with its further movement therein.[8] In addition, this repackaging was within that portion of the definition of "produced" (Title 29 U.S.C.A. § 203(j) which is expressed as "handled, or in any other manner worked on in any State." This Act is remedial and should be liberally construed and applied. Fleming v. Hawkeye Pearl Button Co., 8 Cir., 113 F.2d 52, 56.

 As to Lawrence. As stated hereinbefore, Lawrence is a nation-wide company, independent of the other four companies here. Its business is to act as pledge holder of merchandise in. warehouses pledged by owners to secure bank loans. Its headquarters office is in Chicago. We are concerned with the activities of its employees in the warehouse of Mutual (in which it has space set aside for its exclu-

---

[7] Interpretative Bulletin No. 5 of the Administrator declares "the work week is to be taken as the standard" in determining application of the Act. This standard appears reasonable and is applied here.

[8] The only "repackaging" case we have found is Bock v. Hoffman, 110 Colo. 73, 130 P.2d 691, where the merchandise was held to have left interstate commerce before the repackaging took place.

sive occupancy and use) where it acts as pledge holder for merchandise belonging to Mutual which secures bank loans to Mutual. About 60% of all merchandise handled by Mutual is pledged and stored in Lawrence space. The method of handling such merchandise by Lawrence is as follows. The pledge does not cover specific articles but merely classes of merchandise. There is no restriction upon the withdrawal and substitution by Mutual of pledged merchandise so long as the total value does not fall below 133% of the bank loans to Mutual. Lawrence has about six employees in this warehouse. They are employed and paid by Lawrence but Mutual reimburses Lawrence for all labor costs and expenses. They are engaged principally in moving and checking this merchandise in and out of Lawrence space, keeping clerical records and sending daily reports to the head office at Chicago. A practice has grown up whereby these employees are used frequently to perform work for Mutual under direction of its foremen—such work as unloading incoming merchandise, moving it into the warehouse, loading it out of the warehouse for distribution to the Thomas stores and filling orders to those stores. They and employees of Mutual work indiscriminately in space occupied by Lawrence and in that occupied by Mutual. There is a daily flow of merchandise into Lawrence space and out of it to the Thomas stores. Much of this merchandise comes from outstate and no distinction is observed in handling such and in handling that bought by Mutual in the State. Such duties as are purely receipt from Mutual into or delivery to Mutual from Lawrence space of pledged merchandise, storage and care for therein and clerical recordings and reports are not within the Act. Such duties as have to do with unloading and checking incoming interstate shipments to Mutual and filling orders for, checking and loading shipments for Thomas stores for Mutual are within the Act. The employees of Lawrence who are engaged in any of the latter duties to a substantial extent for any week are, for that period, within the Act.

The result of our determinations as to the entire appeal is modifications of the decree of the trial court to cover by injunction the employees of Thomas, Mutual, Terminal and Lawrence as above stated and to require keeping of proper records by each of such companies.