## UNITED STATES v. HART–CARTER CO. et al.

### Civ. A. No. 1209.

District Court, D. Minnesota,
Fourth Division.

Dec. 11, 1945.

Victor E. Anderson, U. S. Atty., of St. Paul, Minn., and George B. Haddock, Melville C. Williams, and Robert A. Nitschke, Sp. Assts. to Atty. Gen., for plaintiff.

G. A. Youngquist and Fowler, Youngquist, Furber, Taney & Johnson, all of Minneapolis, Minn., for defendant.

JOYCE, District Judge.

The Government in this suit charges a continuing conspiracy between the Hart-Carter Company, certain of its officers, and Henry Simon, Ltd. (hereafter called Simon), a British concern, to restrain and monopolize interstate and foreign commerce in grain disc separators and other grain cleaning machinery designated as "Carter machines", in violation of Sections 1, 2 and 3 of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–3. Injunctive relief is sought.

The proof of the alleged conspiracy consisted largely of a written contract between Hart-Carter and Simon (and their actions pursuant to the contract) by which Simon was given the exclusive territory of the world market, excepting only North America and certain Central American countries, for the sale of Carter machines. It was also claimed that competition between Hart-Carter and Simon was eliminated in some of the so-called "open" territory by means of a supplemental price-fixing agreement. Before the trial defendants moved for sum-

mary judgment on the ground that the contractual relationships between Hart-Carter, and Simon had terminated before the suit was commenced, that there was no intent to resume them and therefore the case was moot. This motion was denied in an order dated January 19, 1945 on the ground that the Government charged a continuing conspiracy and that the defendants were intending to continue the alleged illegal practices and would continue to do so unless enjoined, which presented an issuable fact for trial not determinable on a motion for summary judgment. The above mentioned order among other things stated: "A continuing conspiracy is charged. Whether it existed, or, if it existed is likely to continue are disputed questions going to the merits. I do not here decide that the case is not moot. It may be, but that is an issue of fact. It cannot be denied that defendant's future intention is a very material consideration in determining whether the injunction prayed for here should issue, but the intention of defendant should be resolved only after trial in view of all the circumstances and after the Government has had opportunity to introduce its evidence and cross-examine defendant's witnesses. I do hold that the termination of the contract under the circumstances stated does not, of itself, render the case moot."

Attention is therefore directed to a consideration of the evidence on defendants' future intent.

This contract has been in existence between Simon and Hart-Carter since October 20, 1938 and was a continuation of previous agreements by which Hart-Carter and its predecessors in interest had granted patent licenses to Simon. Paragraph 12 of the 1938 contract reads: "12. This agreement shall come into force on the first of January, 1939, and shall in the first instance run for a period of five years, that is to say until the 31st December 1943. It shall be terminable on this last named date by either party by six calendar months' notice. If not so terminated it shall continue for further periods of one year each, until terminated on the 31st December of any year by six months' notice."

On May 10, 1944, Mr. Ingraham, one of the defendants, wrote a letter to Simon formally cancelling the contract as of December 31, 1944, in accordance with paragraph 12 above quoted. In an accompanying letter he wrote:

"We have been giving considerable thought recently to our position with respect to foreign markets, and as it is obvious that we have very little to gain in a continuation of the agreement existing between us, particularly in view of the 50% royalty tax deducted at the source, we have decided to terminate the agreement as it now exists.

"As to what manner of agreement might be arranged for a continuation of our relationship is not at the present very clear. However, we have decided that the first step to take in the matter as a whole is to get the present contract terminated. Between now and the end of the year some ideas of a working plan may be developed. At best it is probably going to be difficult to find a practical plan under present conditions.

"The accompanying letter we wish to have you consider as formal notice of intention to terminate the agreement, and we have thought best to send this at this time; thus allowing you more time than required for making plans for the future."

That this action of defendants was taken without any prior communication nor connivance with Simon is shown by Simon's letter of May 24th and cable dated May 23, 1944, the latter reading: "Very disturbed by letter of May tenth in view our long collaboration Stop Question of Tax does not seem sufficient to terminate agreement and should therefore appreciate if you would write giving other reasons and also your suggestions for future collaboration Kindest regards".

Hart-Carter made no further explanation to Simon until August 18, 1944. In the meantime, on June 21st, one of the attorneys of record for the Government called on Hart-Carter, which was the first intimation to defendants that any investigation was pending. Another investigation was had the latter part of July or the first part of August, 1944, and it was conceded in the record that defendants cooperated with the investigators in every respect. Mr. Ingraham testified that at the time of giving the notice of cancellation there was no intimation that an investigation was impending, and that when he wrote Simon on August 18th there was no intimation that the Government was going to commence this suit, and that he had no such knowledge until the suit was commenced on September 1, 1944. The Government introduced no evidence to the contrary and did

984

not even cross-examine Mr. Ingraham in this respect. On this record it is an undisputed fact that the cancellation of the contract had no relation to this suit.

■ As evidence of the continuing conspiracy and future unlawful intent of Hart-Carter the Government relies on a few transactions subsequent to the cancellation of the contract and certain statements in correspondence, particularly Mr. Ingraham's letter of May 10th above quoted and his letter of August 18th. In the August 18th letter it is clearly stated that Hart-Carter had been studying the foreign market, had concluded to solicit business outside North America, wished to be unrestricted in its dealings in that market and felt that the Simon contract was no longer to its advantage from a profit standpoint. The letter also points out that Hart-Carter does not wish to terminate all relations with Simon, that a patent license agreement and a sales arrangement could be negotiated in the future and a "mutually satisfactory" basis could be found for handling future machines. Even assuming, but not deciding, that the original contract was illegal, I cannot conclude that this correspondence evidences or even infers a future course of illegal conduct. The terms of the future relationship are extremely vague and it is not contended that a patent license or a sales representative contract would per se violate the Sherman Act. It is quite clear that the 1938 contract was definitely terminated and the future relationship would be entirely different from the contractual relationship which is complained of.

■ Nor do the transactions subsequent to the contract's cancellation aid the Government's contention. Two Irish firms (in the former Simon territory) made inquiry of Hart-Carter and were referred to Simon for a price quotation. The explanation given of this was that at the time, due to its war work, Hart-Carter could not keep up to its domestic orders and was taking three to four months to fill orders instead of the normal three to four weeks and that in any event it did subsequently fill the orders of one of the Irish concerns and at the time of the trial was negotiating for the sale of two machines to another. This evidence seems to me to be a probable and logical explanation and more consistent with the facts than a conspiracy to violate the anti-trust laws.

■ It is my conclusion that the Government has not proved either that a conspiracy to violate the anti-trust laws now exists between defendants and Simon, or that there is a reasonable probability that such a conspiracy will exist in the future. The rule in such a case is well summarized in United States v. Wm. S. Gray & Co., D. C. S. D. N. Y., 59 F.Supp. 665, 666, where defendant's motion for summary judgment was granted on the ground that the anti-trust suit was moot as the corporate defendant had been dissolved and the personal defendant had discontinued his connection with the business with no intention to resume it. The court there said:

"An injunction restraining a defendant may be granted only when a wrongful act is reasonably to be anticipated or there is a threat of such an act. An injunction relates to the future; it should not be issued against a defendant, who was not violating the law, or threatening to violate it when the suit was commenced. [Citing cases.]

"An injunction may not be used to punish for what is past and out of existence."

I also conclude that an injunction should not issue here and that the question of whether there has been a violation is moot.

■ I appreciate the existence of the rule that in a case where a public agency is seeking injunctive relief, the abandonment of an illegal practice after a suit has been commenced does not render the case moot. United States v. Trans-Missouri Freight Association, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007; Walling v. Mutual Wholesale Food & Supply Co., 8 Cir., 141 F.2d 331, 334. In the last cited case there had been an adjudication in this court that the companies were in violation of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., and an injunction issued. Upon appeal it was contended that the cause was moot because the companies had been liquidated in bankruptcy. In rejecting this contention Judge Stone, speaking for the court, said: "Ceasing an illegal practice (by going out of business or otherwise), after institution by a public agency of a proceeding to prevent future violations, does not make the controversy moot. * * * This rule is reenforced if the situation presents a necessity for decision as a guide to the public agency in future similar matters. Walling v. Haile Gold Mines, supra, 4 Cir., 136 F.2d [102] at page 105; Gay Union Corporation v. Wallace, 71 App.

D.C. 382, 112 F.2d 192, 195; Boise City Irr. & L. Co. v. Clark, 9 Cir., 131 F. 415, 418, 419. Further emphasis is placed on this rule where there has been a decision in a lower court which may be used as a precedent in future activities of a public agency. Walling v. Haile Gold Mines, supra, 136 F. 2d at page 105, a case under this Act."

■ A corollary of the rule above stated is expressed by Judge Learned Hand in United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 448, as follows: "The mere cessation of an unlawful activity before suit does not deprive the court of jurisdiction to provide against its resumption; a 'case or controversy' may remain to be disposed of. There are plentiful authorities so holding. [Citing cases]. To disarm the court it must appear that there is no reasonable expectation that the wrong will be repeated."

In this case there is no "reasonable expectation" or "dangerous probability" (see Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518) that the acts complained of will be repeated. Nor is the situation one which "presents a necessity for decision as a guide to the public agency in future similar matters." Walling v. Mutual Wholesale Supply Co., supra. In this case there has been no prior adjudication on the merits that would serve as a precedent as in Walling v. Haile Gold Mines, 4 Cir., 136 F.2d 102, and the activity complained of had ceased before and without any connection with the instigation of the suit. In the Haile Gold Mines case there had been a decision in the lower court holding that the employees of the gold mines were not engaged in interstate commerce so as to be subject to the Fair Labor Standards Act and this decision was being used as a precedent in similar cases. Obviously the enforcement officials would be aided in having an appellate decision on the merits and this fact coupled with the likelihood of future violations was the basis for the holding that the question was not moot, although defendant had temporarily ceased operations. Gay Union Corporation v. Wallace, 71 App.D.C. 382, 112 F.2d 192, was an appeal from a decision of the Secretary of Agriculture denying appellants any allotment of the 1939 sugar quota. By the time the case reached the appellate court the time for the allotment had expired so no specific relief could be given. But the court reasoned that if they did not decide the merits appellant would be without remedy in such a case and in addition there was a strong probability that the Secretary would issue a similar order for the subsequent year and so the order was treated as if it were continuing as in So. Pac. Terminal Co. v. I. C. C., 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310, and held not a moot question. In Boise City I. R. R. & L. Co. v. Clark, 9 Cir., 131 F. 415, the question was the amount of a water rate and although the period for which the rate was fixed had expired, the appellate court said the question was not moot " * * * partly because the rate, once fixed, continues in force until changed as provided by law, and partly because of the necessity or propriety of deciding some question of law presented which might serve to guide the municipal body when again called upon to act in the matter." 131 F. 419. In none of these cases is the aid to the public agency the sole ground for decision and it is doubtful if it could be in view of People of State of California v. San Pablo and Tulare Railroad Co., 149 U.S. 308, 314, 13 S.Ct. 876, 878, 37 L.Ed. 747, where it is stated: "The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property which are actually controverted in the particular case before it. When, in determining such rights, it becomes necessary to give an opinion upon a question of law, that opinion may have weight as a precedent for future decisions. But the court is not empowered to decide moot questions or abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before it."

In the case at bar the Government does not actually urge that it needs any guidance or that a decision on the merits of the contract between Hart-Carter and Simon would assist it in any other case, but does advance the argument that such a determination "should also be helpful to the defendants by giving them guidance and incentive to appraise other existing agreements, such as the contract with Strong-Scott, with a view to cancellation should they decide in the light of this decree that such agreements constitute a violation of the laws of the United States." The Strong-Scott Company is a Canadian concern and a contract between it and Hart-Carter was introduced in evidence for the limited purpose of showing that the effect of the Simon contract was to give Hart-Carter a United States monopoly because

other manufacturers, such as Strong-Scott, did not sell to the United States. However, a perusal of the Strong-Scott contract discloses it is largely concerned with patent licenses and royalties, a factor not present in the Simon contract. I cannot see how a decision on one contract would be helpful to either party in considering the other. They are not the "same" or "similar matter" within the meaning of the cases discussed above.

The situation here is similar to that in United States v. Hamburg-Amerikanische, etc., D.C., 239 U.S. 466, 36 S.Ct. 212, 60 L.Ed. 387; United States v. United States Steel Corp., 251 U.S. 417, 419, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121; and Standard Oil Co. Indiana v. United States, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926. In the Hamburg case the legality of a contract between steamship companies in alleged violation of the Sherman Act was held to be moot because World War I automatically dissolved it and made any relationship between the companies impossible. In distinguishing the Southern Pacific and Trans-Missouri Freight Co. cases the court said [239 U.S. 466, 36 S.Ct. 217]: "The difference between this and the Trans-Missouri case was clearly laid down in Mills v. Green, 159 U.S. 651, 16 S.Ct. 132, 40 L.Ed. 293, where, after announcing the general rule as to the absence of authority to consider a mere moot question, and referring to possible exceptions resulting from the fact that the want of actuality had arisen either from the consent of the parties or the action of a defendant, it was declared [page 654 of 159 U.S., page 133 of 16 S.Ct., 40 L.Ed. 293]: 'But if the intervening event is owing to the plaintiff's own act or to a power beyond the control of either party, the court will stay its hand.'"

In the United States Steel Corporation case [251 U.S. 417, 40 S.Ct. 297] the practices complained of in violation of the Sherman Act were voluntarily abandoned nine months before suit and not because of "prophecy of or dread of suit" and there had been no resumption or "'dangerous probability' of their resumption." It was held that the suit should be dismissed. The Standard Oil Company case was an antitrust suit where licenses containing territorial restrictions on the production of cracked gasoline and also an option to purchase gasoline shipped into its sales territory were voluntarily cancelled after suit was brought but before the decree was entered. On this phase of the case the court said (283 U.S. 182, 51 S.Ct. 428, 75 L.Ed. 926): "As the relief here sought is an injunction, and hence relates only to the future, United States v. Hamburg-Amerikanische Packetfahrt-Actien Gesellschaft, 239 U.S. 466, 475, 36 S.Ct. 212, 60 L.Ed. 387; the alleged validity of such provisions has become moot. Berry v. Davis, 242 U.S. 468, 37 S.Ct. 208, 61 L.Ed. 441; Commercial Cable Co. v. Burleson, 250 U.S. 360, 39 S.Ct. 512, 63 L.Ed. 1030; Alejandrino v. Quezon, 271 U.S. 528, 46 S.Ct. 600, 70 L.Ed. 1071; United States v. Anchor Coal Co., 279 U.S. 812, 49 S.Ct. 262, 73 L.Ed. 971."

There is no substantial difference between the principle in these cases and the one at bar. The case will be dismissed and the Government is allowed an exception. Defendants will submit findings of fact and conclusions of law in accordance with the views herein expressed.